[S. F. No. 10543.   In Bank.—December 26, 1924.]

# G. L. WILKINSON, as Administrator, etc., Respondent, v. THE UNITED RAILROADS OF SAN FRANCISCO (a Corporation), Appellant.

[1] New Trial—Grounds—Insufficiency of Evidence—General Order—Presumption.—Where an order granting a new trial is a general one and does not specify that it was granted on the ground that the evidence was insufficient to justify and sustain the verdict, it must be presumed on appeal that the order was not based on that ground.

[2] Id.—Trial by Jury—Verdict Contrary to Instructions — Verdict Against Law.—When a case is tried by a jury, and the sufficiency of the evidence is not involved, it is only when the verdict is contrary to or in conflict with the instructions given the jury by the court that the verdict is "against law" in order to be a ground for a motion for a new trial.

[3] Negligence—Personal Injuries—Action for Damages—Crossing Railroad Track — Signals—Custom — Instructions.—In an action for damages for the death of a person occurring while crossing the railroad track, alleged to have occurred through the negligence of the defendant railroad, an instruction with reference to the care one intending to cross such track must use, to the effect that "if the view of the track is obstructed she must take *great pains to listen. If taking these precautions she would have seen or heard the approaching car, the very fact of injury will justify the inference and conclusion that she did not take the required precautions,*"—is open to the criticism that it invades the province of the jury in the portions italicized.

[4] Id.—Dependence upon Custom to Give Signals.—In such a case an instruction that a person who is about to cross a railroad track at a place where ordinarily the motorman gives appropriate signals of the approaching of cars *may not depend upon such custom or even upon a duty enjoined by law to give such signals;* has no right not to look or listen because she has heard no such signals,—is objectionable in the italicized part in that it invades the province of the jury and is also incorrect in what it declares as to signals.

1.  See 20 Cal. Jur. 196.
2.  See 20 Cal. Jur. 130.
3.  Duty of pedestrian crossing tracks to stop, look, and listen, notes, 90 Am. Dec. 780; 3 Ann. Cas. 334; Ann. Cas. 1915B, 690; 23 L. R. A. (N. S.) 1224; 15 L. R. A. (N. S.) 254. See, also, 25 R. C. L. 1275; 22 R. C. L. 1035–1047.

[5] ID.—SPEED OF CARS—INSTRUCTION.—In such a case an instruction "that *at the place* where this accident is shown to have occurred there was no law regulating the speed of cars. The defendant *had a right to propel its cars at any rate of speed* which was consistent with due care in the business of railroading," does not correctly state the law as to the duty of the common carrier with respect to the speed of its cars.

[6] ID. — CROSSING RAILROAD TRACK — CARE—STOP, LOOK, AND LISTEN RULE—APPLICATION.—If there is reasonable cause to believe there is no danger, it is not negligence *per se* not to stop, look, or listen in approaching a railroad crossing.

[7] ID.—CROSSING ONE TRACK TO BOARD CAR ON ANOTHER—WHEN NOT REQUIRED TO STOP, LOOK, AND LISTEN.—In such a case the deceased was not required to stop, look, and listen before crossing one track of the interurban railroad to board a car on the other track, where the accident occurred at the usual stopping place of the cars, at which place the company was required to exercise a higher degree of care than, for instance, at a crossing, or between points, even on a private right of way; and the rule applicable to stations does not require the passenger, who is lawfully on the premises, to stop, look, and listen before approaching intervening tracks to board a train. The duty to stop, look, and listen is not an absolute one, but one the exercise of which is dependent upon conditions.

[8] ID.—STATION—DEFINITION.—The word "station" would cover any place where trains usually and ordinarily stop, and it is held in this case that the inclosure and adjoining area come within the meaning of a "station."

[9] ID. — MAINTENANCE OF STATIONS — INVITATION TO PUBLIC. — The maintenance of stations or stopping places by railroads is an invitation to the public to patronize the line, and the common carrier should be required to afford protection commensurate with the risk involved. It would make no difference whether the stopping place is patronized by a few or many passengers.

6. Reasonable belief that no train is approaching as relieving traveler of imputation of negligence *per se* in failing to look and listen, notes, 9 Ann. Cas. 216; Ann. Cas. 1914D, 1020.

7. Duty to look and listen before crossing interurban electric line on company's own right of way, note, 23 L. R. A. (N. S.) 1224.

8. Duty of passenger embarking or disembarking at station to stop, look, and listen before crossing track to his train, notes, 13 L. R. A. (N. S.) 620; 27 L. R. A. (N. S.) 128; 31 L. R. A. (N. S.) 338.

9. See 22 R. C. L. 921–924.

[10] ID.—CARE AT STATION.—Wherever passengers are accustomed to be received upon a train, whether at a station-house or elsewhere, railroad companies are bound to keep in a safe condition for transit the ordinary space in which passengers go to and from the train, and the latter have the right to assume that the ground adjacent to the cars, within the limits which persons necessarily and naturally go to and from them, admits of their going safely out and in.

[11] ID.—CROSSING TRACK—PRESUMPTION.—In all cases where it is absolutely necessary, inconvenient to do otherwise, or is the customary practice, acquiesced in by the common carrier of passengers to cross tracks at stations, the mere crossing of the tracks by a passenger on his way to or from a train raises no presumption of negligence against him; and where a passenger is required to cross the company's intervening tracks in order to take his train or to leave it, or to change from one train to another, it is not negligence *per se* not to stop, look, and listen for approaching trains before so crossing.

[12] ID.—STEAM AND INTERURBAN TRAINS—OPERATION WITH RELATION TO STATIONS—RULE—CARE.—There is no reason why the "operation" of trains with relation to stations should not be the same in both steam and interurban trains; nor should there be any distinction as to the relative degree of care of common carriers and passengers at the stations of a steam railroad and of an interurban railway.

[13] ID.—CARE—INSTRUCTIONS—QUESTION FOR JURY.—In such a case the deceased, as a matter of law, was not required to stop, look, and listen before stepping from a station the side of which was located approximately six feet from the westerly rail of the westerly track across which she had to go to board the train on the easterly tracks, and the question of the proximate cause of the accident should have been submitted to the jury under proper instructions.

[14] ID.—NONSUIT.—Where the testimony is sufficient upon which to base a verdict that the negligence of the railroad was the proximate cause of the accident, a motion for a nonsuit should be denied and the question submitted to the jury.

[15] ID.—DIRECTED VERDICT.—In such a case the court may direct a verdict for the defendant where the evidence is undisputed or is of such conclusive character that the court, in the exercise of a sound judicial discretion, will be compelled to set aside a verdict returned in opposition to it, but in this case it is held that under the evidence the motion should have been denied.

---

11.  See 22 R. C. L. 919.

[16] ID.—STATION GROUNDS—SAFETY OF.—Where a railroad undertakes to establish on its own property a station and station grounds at a certain point it becomes charged with a duty of providing such accommodations as will afford safety and protection to its passengers in the use thereof.

[17] ID.—NEW TRIAL—PROPER GRANTING OF.—In this action it is held that the court properly granted a motion for a new trial.

(1) 4 C. J., p. 785, sec. 2736. (2) 29 Cyc., p. 819. (3) 33 Cyc., p. 1131. (4) 33 Cyc., p. 1140. (5) 33 Cyc., p. 1134. (6) 33 Cyc., p. 1003. (7) 33 Cyc., p. 1027. (8) 33 Cyc., p. 844. (9) 33 Cyc., p. 805. (10) 33 Cyc., p. 763. (11) 33 Cyc., p. 878. (12) 36 Cyc., p. 1473. (13) 33 Cyc., p. 907. (14) 33 Cyc., pp. 896, 898. (15) 33 Cyc., p. 897. (16) 33 Cyc., p. 638. (17) 29 Cyc., p. 1009.

APPEAL from an order of the Superior Court of San Mateo County granting a motion for a new trial. John L. Hudner, Judge Presiding. Affirmed.

The facts are stated in the opinion of the court.

Wm. M. Abbott, K. W. Cannon, Ross & Ross and Ivores R. Dains for Appellant.

Hugo D. Newhouse and Russell P. Tyler for Respondent.

Dunne, Brobeck, Phleger & Harrison and A. L. Whittle, Attorneys for Key System Transit Co., *Amici Curiae.*

LAWLOR, J.—The defendant has appealed from an order of the superior court of the state of California, in and for the county of San Mateo, granting plaintiff's motion for a new trial, after a verdict by a jury in favor of the defendant in an action brought by the administrator to recover damages for the death of the deceased, Elizabeth G. Wilkinson, an intestate, alleged to have been caused by the negligence of the defendant in operating its interurban railroad between San Francisco and San Mateo.

The complaint alleges that the defendant corporation maintained and operated a double track suburban line between the city of San Francisco and the city of San Mateo, over the private right of way of said corporation and passing through the town of San Bruno; that on the third day of

16. See 22 **R. C. L.** 919.

July, 1920, said corporation carelessly and negligently maintained, · controlled, and managed a certain station at this right of way in the vicinity of the town of San Bruno; that the negligence consisted in this, that the station was so constructed that the entrance was on the side facing the tracks and the other three sides consisted of blank walls; that the said side of the building was approximately six feet from the westerly rail of the westerly track; that in order for a passenger to board a north-bound car it was necessary to cross the westerly track and there was no opportunity to stop, look, and listen for approaching or passing cars; that the overhang of the cars was three feet; that the station was so constructed that the motorman could not observe any person approaching and desiring to board a north-bound car; and that on July 3, 1920, the deceased, Elizabeth G. Wilkinson, while in the act of crossing the westerly track near the San Bruno crossing was struck by one of the cars of defendant corporation, sustaining severe injuries from which she died. As a second cause of action it was alleged "that on and in the vicinity of the station" near the San Bruno crossing the defendant corporation displayed numerous signs bearing the words "Cars Stop Here"; that at the time and place above mentioned the defendant corporation, by its agents, servants, and employees, so negligently and carelessly maintained, operated, and controlled a south-bound car at a high and excessive rate of speed and at a rate of speed in excess of thirty-five miles an hour, failed to stop said car at the station notwithstanding the signs displayed and that such negligence and carelessness caused the injuries and death of the deceased, Elizabeth G. Wilkinson.

General and special demurrers were interposed to each count. Defendant's demurrer to the first cause of action was sustained and that to the second cause of action overruled. The answer of defendant corporation to the second cause of action set up the defense of contributory negligence as the proximate cause of the injuries sustained. A verdict for defendant corporation was rendered by the jury, upon which verdict judgment was entered for defendant. Plaintiff interposed a motion for a new trial, which was granted, and this is the appeal taken from the order granting said motion for a new trial.

The accident out of which the action arose occurred on July 3, 1920, in San Mateo County near the San Bruno crossing at a station or waiting-room maintained by the appellant upon its own private right of way south of the point where the Bay Shore road crosses the tracks of the United Railroads and the Southern Pacific Company. According to the testimony the station or waiting-room is 200 feet south of the San Bruno crossing and 116 feet south of the point where the Bay Shore road crosses the parallel tracks of the appellant and the Southern Pacific tracks, which are to the east of appellant's tracks. The station or waiting-room is a structure about eight feet wide and ten feet long, with three blind walls, the easterly side being open and facing the westerly rail of the tracks. At about 11 o'clock A. M. on the day above mentioned appellant's northbound interurban car was approaching the station and was stopping to allow a passenger to alight. At this juncture, as a south-bound interurban car was approaching the station on the inside or westerly track, which was nearer the station and about ten or twelve feet from the northerly end thereof, the deceased, who had been sitting in the station, stepped from the platform intending to board the north-bound car and was instantly struck by the right corner of the bumper of the south-bound car. As a result of the injuries sustained she died some three hours later.

Respondent's notice of intention to move for a new trial was upon five grounds: (1) Insufficiency of the evidence to justify the verdict; (2) the verdict is against law; (3) error in law occurring at the trial and excepted to by the plaintiff; (4) errors in law occurring at the trial and excepted to by the plaintiff; and (5) errors in law occurring at the trial and excepted to by the plaintiff, to wit, the giving to the jury the instructions and each and every one of the instructions requested by the appellant. After the submission of the motion and hearing the argument thereon the motion for a new trial was granted.

We will at this point state the evidence bearing on the points relied upon for reversal.

James P. Walsh, who was a passenger on the north-bound car, riding in the rear end of the car on the platform and leaning through the windows nearest to the inbound track,

testified that his car was stopping to let him off at the station; that he could see the south-bound car coming from San Francisco before it reached the crossing, which was about 225 feet from the station; that the south-bound car, going between thirty and thirty-five miles an hour, gave no warning signals and did not stop at the station; that he saw the deceased, who was carrying a basket, about two feet in front of the "cabin," but did not see the car strike her; and that after the car passed she was lying about four feet from the westerly rail of the westerly track, between the south end of the station and a fence fourteen feet to the south thereof.

Frederick Horning, the motorman who was operating the south-bound car which struck the deceased, testified: "I first saw the lady just as she stepped out of the waiting-station. She came right out of the northwest corner of the waiting-station. My car came over the highway, and when she stepped out it was ten or twelve feet from the station. When I first saw the lady she was about three feet from the westerly rail of the westerly track. I immediately reversed my car which is commonly known as slugging and threw on the air. . . . The car was in the neighborhood of forty-five feet long, maybe a little over. Has an overhang or overlap on either side of the rails of three feet. The distance from the waiting-station to the track I should say was about six feet, or about three feet between the car and the station. She stepped right into the clearance when I first saw her. She made one step which brought her in a position where the car came up to her." He also testified that he was going about fifteen miles an hour at the San Bruno crossing and that before he crossed he blew the whistle twice and rang the foot gong; that he then increased the speed "five notches" and when ten or twelve feet from the station the deceased stepped out of the station; that "she neither looked to the right or left. She had her head down and had the package in one arm and a package in the other, and never looked to the right or to the left"; that he only stopped the car if he got a signal from the conductor or unless someone was in sight to take his car; that he could not see anyone inside the station but had seen people at other times step out of the station for the purpose of getting on the car; that he was going about fifteen miles an hour and after he

put on the brakes the car went about sixty-five feet. The passenger above mentioned testified that the south-bound car stopped about 275 feet south of the station, and Sebastian de la Maggiora testified that when he saw the south-bound car backing up after the accident it was about 150 or 175 feet from the station. Otto Jacobsen, who qualified as an expert, judging the comparative distance interurban cars of the type used will go after the brakes are applied and the current reversed, testified that if the car traveled a distance exceeding 200 feet after the application of the air-brakes and the reversal of the motor it must have been going at a speed in excess of thirty miles an hour.

William T. Hunter, the conductor on the south-bound car, testified that the whistles were blown for the San Bruno crossing and that the speed was about fifteen miles an hour. Anna E. Finnegan, a passenger on the south-bound car, testified that she also heard the whistle at the San Bruno crossing and after it passed the crossing she saw "a lady walk out and then I heard some little rumbling noise." Frederick W. Webb, the motorman on the north-bound car, which stopped at the station, testified that as the front end of his car was passing the station he noticed a lady was standing at the inside of the station, that she started to pick up some packages on the bench; that his attention was attracted to the south-bound car by the whistle sounded before it reached the San Bruno crossing, and that the speed was possibly eighteen miles an hour. Lewis Eugene Jones, the conductor on the north-bound car, testified that he had signaled his motorman to stop at the station to allow a passenger to alight; that just as the car was in the act of coming to a complete stop this passenger stepped off and just as he stepped off he noticed the other car and the deceased at the same time, and that she was just in the act of stepping out of the station when the south-bound car came into view.

[1] 1. As to the first ground of the motion for a new trial that the evidence is insufficient to sustain the verdict, it is sufficient to say that since the order granting the new trial was a general one and did not specify that it was granted on the ground that the evidence was insufficient to justify and sustain the verdict, it must be presumed on this appeal

that the order was not based on that ground. (Sec. 657, Code Civ. Proc.)

[2] 2. This ground is that the verdict is against law. When a case is tried by a jury, and the sufficiency of the evidence is not involved, it is only when the verdict is contrary to or in conflict with the instructions given the jury by the court that the verdict is "against law" in order to be a ground for a motion for a new trial. (*Brumagim* v. *Bradshaw,* 39 Cal. 24; *Miller* v. *Griffith,* 4 Cal. App. 341 [88 Pac. 285].) It is clear that the order granting a new trial cannot be sustained upon this ground.

3. The third, fourth, and fifth specifications of error in the motion for a new trial involve certain instructions given to the jury at the request of appellant. The instructions read as follows:

"VII. I instruct you that the tracks of a street railway company are in themselves a sign of danger, and one who approaches same must exercise his faculties of sight and hearing to wait and listen for cars, and his failure to so act is negligence.

"VIII. It was the duty of . . . deceased before approaching the street car track of the United Railroads, at or about the point where the collision occurred, to make reasonable use of her faculties of sight and hearing to watch and listen for approaching cars.

"X. I instruct you that it was the duty of . . . deceased, before approaching the street car track in question, to make reasonable use of her faculties of sight and hearing to watch and listen for cars going in either direction. Any failure on her part to perform this duty constitutes negligence.

"XI. I instruct you that the street car track of an interurban railway is a sign of danger, and it is the duty of all persons on approaching or attempting to cross such track to exercise ordinary care to save themselves from a collision with any approaching car. Any failure to perform this duty constitutes negligence.

"XII. I instruct you that it is the duty of a person approaching a railroad track to use ordinary care in selecting a time and place to look and listen for coming cars, and she should stop for the purpose of making such observations when necessary.

"XIII.   A person who is about to cross a railroad track at a place where ordinarily the motorman gives appropriate signals of the approaching of cars, *may not depend upon such custom or even upon a duty enjoined by law to give such signals;* she has no right not to look or listen because she has heard no such signals.

"XIV.   The railroad track of an interurban railway must itself be regarded as a sign of danger, and one intending to cross must avail herself of every opportunity to look and to listen for approaching cars.   What she must do in such a case will depend upon circumstances.   If the view of the track is obstructed she must take *great pains to listen.   If taking these precautions she would have seen or heard the approaching car, the very fact of injury will justify the inference and conclusion that she did not take the required precautions.* . . .

"XVIII.   I instruct you that the person in charge of a car with a clear track before him has a right to assume that people will not suddenly undertake to cross in front of it. . . .

"XX.   Where the alleged negligence of the motorman consists of the alleged omission of duty suddenly and unexpectedly arising, such as a person stepping suddenly upon the track of the approaching car without warning, it is incumbent upon the plaintiff to show that the circumstances were such that the motorman had an opportunity to become conscious of the facts giving rise to the duty and reasonable opportunity to perform it, before the railroad company can be held liable on the ground of negligence.

"XXI.   . . . If, therefore, you find that at the time deceased was approaching the track upon which the street car was approaching, she was entering into a place of great and imminent danger and had the burden resting upon her to use ordinary care to save herself from injury, I instruct you that you can take such facts into consideration in determining what actual amount of care it was necessary for her to exercise in such circumstances in order to meet the legal requirement of ordinary care.   And if she did not exercise sufficient care under the then existing circumstances to constitute such ordinary care, and solely in consequence thereof the heirs of said deceased suffered the damages com-

plained of, I instruct you that the plaintiff cannot recover and your verdict must be in favor of the United Railroads of San Francisco.

"XXII.  The court instructs you that *at the place* where this accident is shown to have occurred there was no law regulating the speed of cars.  The defendant *had a right to propel its cars at any rate of speed* which was consistent with due care in the business of railroading."

The trial court filed an opinion in connection with the order granting a new trial, which opinion appears in the bill of exceptions.  (See 2 Cal. Jur. 488.)  The opinion states that "the court undoubtedly by its instructions required more than ordinary care of deceased.  For instance, it charged that she 'must avail herself of *every* opportunity to look and listen . . . ,' and that 'she must take *great* pains to listen.'  Whereas her duty was simply to use ordinary (reasonable) care; and whether she exercised such in that and every other respect was for the jury.  Moreover the court instructed as to inference and conclusion to be drawn by the jury from supposed facts, an unwarranted invasion of its province.  The court also charged that a person may not rely on a custom or duty of the motorman to signal. It would seem the decisions are not quite in harmony in respect to such reliance . . . but certainly it must be left to the jury to determine whether the dependence of the person on such custom or duty was, under the circumstances, an omission to do something he (she here) ought to have done.  Such instruction was as to matter of fact as well as argumentative.  Aside from consideration of the proximity of the station house or shed to the tracks and consequent exceedingly narrow clearance which might have contributed to the confusion or oversight of deceased leading to her injury and death, the court is not satisfied with the verdict reached  under the instructions given, and accordingly such verdict is set aside and a new trial granted."

[3]  We have italicized a portion of instruction XIV as being open to the criticism that it invades the province of the jury.  [4]  The portion of instruction XIII which we have italicized is similarly objectionable and is also incorrect in what it declares as to signals.  [5]  Instruction XXII does not correctly state the law as to the duty of the common carrier with respect to the speed of its cars.  We shall next

discuss the instructions to the effect that the deceased was guilty of contributory negligence if she did not stop, look, and listen on leaving the station. The instructions as contended by respondent embody the "stop, look, and listen" rule and also require the deceased to exercise every degree of care as distinguished from ordinary care. Respondent contends that this rule of law is applicable only to steam railways and not to electric interurban railways. It is conceded by appellant that the rules governing the care required of a pedestrian applicable in the cases of a street railway in a city and in cases where a steam railroad is involved are different in that the *quantum* of care required in the former case is less than in the case of the latter. But appellant contends that an electric interurban railway operating over a private right of way comes within the rules applicable to steam railroads and not those applicable to street-cars. The respective briefs of the parties devote considerable space to this point on the theory that upon its determination the correctness of the instructions must depend. We do not think this is the decisive point on the appeal for the reason that if it be assumed the principle of stop, look, and listen applies as well to the operation of interurban as to steam railroads, this is not a case in which the failure to stop, look, and listen is negligence *per se.* [6] Briefly stated, the rule of stop, look, and listen is that a traveler approaching a railroad crossing must stop, look, and listen (3 Elliott on Railroads, 3d ed., sec. 1661), but if there is reasonable cause to believe there is no danger, it is not negligence *per se* not to stop, look, or listen (1 Shearman & Redfield on Negligence, 6th ed., sec. 90).

[7] There are two reasons for the conclusion that the deceased in this case was not required to stop, look, and listen before she attempted to board the car and, therefore, the instructions were erroneous. In the first place, the accident occurred at the usual stopping place of the cars and, hence, the appellant was required to exercise a higher degree of care than, for instance, at a crossing, or between points, even on a private right of way. And in the second place the rule applicable to stations does not require the passenger, who is lawfully on the premises, to stop, look, and listen before approaching intervening tracks to board a train. The duty to stop, look, and listen is not an abso-

lute one, but one the exercise of which is dependent on conditions. ''The circumstances which will excuse failure to look and listen usually arise, first, where by looking and listening, the consequences of the defendant's negligence would not have been avoided; second, in the presence of some imminent danger or emergency sufficient to divert the attention of a person of reasonable fortitude and self-possession; third, where one has entered on the crossing under an express or implied invitation of the company's employees giving reasonable assurance of safety. The last instance more usually occurs at stations where a way has been left open by the company across other tracks for an approach to the station or train. . . . '' (22 R. C. L. 1035, 1036.)

[8]  It seems clear that the inclosure and adjoining area in this case come within the meaning of a ''station'' as that term is employed in the authorities. It was said in *Fernette* v. *Pere Marquette R. Co.*, 175 Mich. 653, 662 [141 N. W. 1084], that the word ''station'' would cover any place where trains usually and ordinarily stopped. The court said: ''We think the word as used . . . should be held to be broad enough to cover so much of the track adjacent to the structure as is commonly used by trains. . . .'' It is true the train was not within station switches but it was in the immediate vicinity of side-tracks. . . . '' In *Daniel* v. *Doyle,* 135 Ark. 547 [204 S. W. 210], it was stated that in its broad sense a railroad ''station'' is a place at which both freight and passengers are received and discharged, and the word includes a flag station. In *Railroad Commission of Texas* v. *Pecos & N. T. Ry. Co.* (Tex. Civ.), 212 S. W. 535, it was declared that a place may become a ''station'' either by designation by the railroad, by designation by statute, or by being established as a siding or stopping place to receive and discharge passengers and freight. It would not seem to be necessary in order to constitute a station or station grounds that it should have baggage-rooms, ticket offices, company employees, and the other incidents of stations at the more important centers. To hold that the structure, the cattle-guards, and the adjoining fence and the paved area in this case did not constitute a station and station grounds, and did not call for a high degree of care on the part of the common carrier, would leave the traveling public

exposed to extraordinary and unlooked for risks and tend to lessen the lawful responsibility of such common carrier. [9] The maintenance of stations or stopping places is an invitation to the public to patronize the line, and the common carrier should be required to afford protection commensurate with the risk involved. It would make no difference whether the stopping place is patronized by a few or by many passengers.

Appellant's answer denied the allegation of the complaint that a sign ''Cars Stop Here'' was on or near the station and in the oral argument counsel for respondent stated that evidence was offered under the issue, but that it was not admitted.

[10] We have found no authority which in principle draws any distinction between the relative degrees of care of the common carrier and the passenger at the various kinds of stopping places where passengers are received or discharged. Discussing the degree of care due to persons using stations and the surrounding premises, it is said in 1 Thompson on Negligence, section 1006, pages 922, 923: ''Wherever passengers are accustomed to be received upon a train, whether at a station-house or at a water-tank outside of the station, or elsewhere, railroad companies are bound to keep in safe condition for transit, the ordinary space in which passengers go to and from the train, and the latter have the right to assume that the ground adjacent to the cars, within the limits of which persons necessarily and naturally go to and from them, admits of their getting safely out and in. . . . '' The law is well settled concerning the application of the rule of ''stop, look, and listen'' in cases where accidents occur in crossing over intervening tracks at stations or depots. [11] In all cases where it is absolutely necessary, inconvenient to do otherwise, or is the customary practice, acquiesced in by the common carrier of passengers, to cross tracks at stations, the mere crossing of the tracks by a passenger on his way to or from a train raises no presumption of negligence against him. And where a passenger is required to cross the company's intervening tracks in order to take his train or to leave it, or to change from one train to another, it is not negligence *per se* not to stop, look, and listen for approaching trains before so crossing. (2 Shearman & Redfield on Negligence,

6th ed., sec. 525, n. 534, and cases cited.)    In 3 Thompson on Negligence, section 2701, page 170, it is said: "It is almost needless to add that this duty of providing safe approaches to its stations extends to the obligation of *taking care in moving its trains* so as not to injure passengers who are obliged to cross its track or tracks. . . . On the other hand, passengers who are obliged, in boarding a train or in leaving it, to cross railroad tracks intervening between the train and the station, have the *right to assume* that the company will so regulate the movement of its trains on such tracks as to enable them to cross the tracks in safety."    Thompson, *supra,* section 2705, page 175, further states "that the passenger, while not absolved from the duty of exercising care for his own safety, has the *right to presume* that the tracks intervening between the places where he is obliged to alight and the station will be kept safe while he is crossing; so that the mere fact that he fails to look and listen for an approaching train before attempting to cross, will not necessarily be ascribed to his contributory negligence, and will not prevent a recovery of damages if he is struck by such a train."    It was held in the following cases that the rule of stop, look, and listen does not apply as matter of law to passengers at stations and that the issue should be submitted to the jury: *Sonier* v. *Boston etc. R. Co.,* 141 Mass. 10 [6 N. E. 84] ; *Richmond etc. Ry. Co.* v. *Powers,* 149 U. S. 43 [37 L. Ed. 642, 13 Sup. Ct. Rep. 748, see, also, Rose's U. S. Notes] ; *Terry* v. *Jewett,* 78 N. Y. 338; *Chaffee* v. *Boston etc. R. Co.,* 104 Mass. 108; *Hirsch* v. *New York etc. R. Co.,* 53 Hun, 633 [6 N. Y. Supp. 162] ; *Brassell* v. *New York Central etc. R. Co.,* 84 N. Y. 241; *Tubbs* v. *Michigan Central R. Co.,* 107 Mich. 108 [61 Am. St. Rep. 320, 64 N. W. 1061], and *Atchison, Topeka & Santa Fe Ry. Co.* v. *McElroy,* 76 Kan. 271 [123 Am. St. Rep. 134, 13 L. R. A. (N. S.) 620, 91 Pac. 785].    In the latter case a messenger crossing an intervening track after delivering a package to a passenger on a train on a side-track recovered for an injury sustained while he was in that position.    That court held that when a railroad company causes a passenger train to stop on a side-track, leaving other tracks between it and the depot platform, it is negligence to permit another train to pass between such passenger train and the depot at a high rate of speed and without giving any warning thereof by

ringing the bell, sounding the whistle, or otherwise. It was further held that the rights of persons having business with the train and the duty of the common carrier toward them are the same as if the entire space between the depot and the train constituted the platform. The syllabus states: "Under such circumstances, passengers and other persons rightfully there have a right to assume that they will be protected from danger by the company, and are under no obligation to anticipate and guard against the approach of other trains. The ordinary rule of 'look and listen' does not apply to such a situation." The cases show that the passenger has a *right to assume* that the company will so regulate its trains that the tracks will be free from obstruction and danger when passenger trains stop at a depot to receive and deliver passengers, and that the rule which requires a person to stop, look, and listen before crossing a railroad track has little, if any, application where, by the accommodations provided by the company, it is necessary for passengers to cross the track in passing to and from the depot to the cars. (Shearman & Redfield, *supra;* 3 Elliott on Railroads, 3d ed., sec. 1661, n. 70, and notes in 13 L. R. A. (N. S.) 620, 27 L. R. A. (N. S.) 128, and 31 L. R. A. (N. S.) 338.)

[12]    We have assumed there is no difference in principle in the operation of steam and interurban trains; and we perceive no reason why the "operation" of trains with relation to stations would not be the same in both modes of service. Again, we have found no authority which draws any distinction as to the relative degree of care of common carriers and passengers at the stations of a steam railroad and of an interurban railway. 3 Elliott on Railroads, third edition, section 1519, says: "Interurban railroad companies, as carriers of passengers, owe to their passengers the duty of exercising the same high degree of care required of other carriers of passengers." *Karr* v. *Milwaukee Light, Heat & Traction Co.,* 132 Wis. 662 [122 Am. St. Rep. 1017, 13 L. R. A. (N. S.) 283, 113 N. W. 62], was a case of an interurban common carrier which operated electric cars over two parallel tracks. The stopping place for the cars was called a station, but there was no platform or inclosure; merely a widened roadbed, a board sign with the name of the station thereon, and an illuminated device placed be-

tween the parallel tracks for enabling passengers to signal approaching cars at night. The court held that the plaintiff in that case became a passenger upon entering the depot grounds by the approaches furnished by the carrier, and that it was a question for the jury whether the plaintiff, after giving the signal according to the printed instructions of the company, was guilty of contributory negligence in crossing the track, as it was necessary for him to do in order to board his car. The syllabus in *Graven* v. *MacLeod,* 92 Fed. 846 [35 C. C. A. 47], was quoted in that opinion as follows: " 'Where a carrier so operates its trains at a station that a passenger is impliedly invited to cross an intervening track in going to or leaving his train, he is chargeable only with the exercise of reasonable care to avoid danger, and is not necessarily guilty of contributory negligence in failing to look and listen for an approaching train before crossing such track.' " *Anderson* v. *San Francisco-Oakland Terminal Rys.,* 61 Cal. App. 21 [214 Pac. 289], is a case where an "Umbrella Shed" or waiting-room was maintained on the private right of way of the electric company and in taking an Oakland car it was necessary for the passenger to cross the intervening tracks upon which the cars to Piedmont operated. The plaintiff was injured by a train passing on the intervening tracks without giving any warning that it did not intend to stop. It was claimed the plaintiff was guilty of contributory negligence in taking a position to board her car upon the assumption the other train would stop. The court held she was not guilty of contributory negligence in proceeding in the customary manner in order to board her car; that the company having provided a waiting-room for persons desiring to board its cars, it owed to her a higher degree of care than it would to persons in the public streets.

[13] We do not think that the deceased was, as matter of law, required to stop, look, and listen before she stepped from the station. The instructions were, therefore, erroneous. It follows that the question of the proximate cause of the accident should have been submitted to the jury under proper instructions.

Two cases relied upon for the conclusion that the deceased in failing to stop, look, and listen was guilty of contributory negligence as a matter of law are distinguishable

on the facts. In the first case, *Klusman* v. *Pacific Electric Ry. Co.,* 190 Cal. 441 [213 Pac. 38], the accident occurred at the intersection of Berkeley, Alvarado, and Glendale Boulevards, in the city of Los Angeles. The plaintiff had alighted from a local car at this intersection; she walked along the side of the car and passed around the end, stepped upon a middle track and was almost instantly struck by an interurban car of the defendant company traveling in the same direction. In the second case, *Ross* v. *Pacific Electric Ry. Co.,* 39 Cal. App. 658 [179 Pac. 538], the accident occurred at the intersection of two streets in the city of Los Angeles. The street-car was stopped at the usual place for passengers getting off, and plaintiff alighted, walked around the rear of the car, intending to cross the opposite track, which course was in the direction of her home, and was knocked down by the projecting step of a car traveling in the opposite direction. In each of these cases it was properly held that the injured party was guilty of contributory negligence, for it was clearly negligence not to wait for the car to go forward in order that the approach of cars on the other track could be observed. But the question here is not whether the deceased exercised ordinary care at a street crossing, but rather whether she exercised that degree of care in starting for a car from a station or inclosure without, as one witness testified, stopping to look and listen. *Chrissinger* v. *Southern Pac. Co.,* 169 Cal. 619 [149 Pac. 175], is cited to the proposition that respondent was guilty of contributory negligence and that a nonsuit should have been granted. In that case the accident happened at the intersection of Sycamore Street and the railroad crossing near the station at Willows. There were four tracks—the main track being the second track from the station. The plaintiff left his bicycle at the curb near the north end of the station and proceeded to cross the tracks to a mail-car on a siding headed south to post a letter. He was struck by a train coming from the south. A nonsuit was granted, and in affirming the judgment it was said: "From the most favorable view of the facts the court must have concluded that the plaintiff's own negligence was the proximate cause of the injury. . . . In any view of the testimony we are forced to conclude that had plaintiff used the slightest care the accident would not have happened." In that case the plain-

tiff testified that in crossing the main track he looked to the right and left. The plaintiff was not a passenger, although it was assumed in the opinion, notwithstanding the nonsuit, that if he had looked both ways, as he testified, he would have seen the approaching train. The decision was not put on the ground it was negligence *per se* for the plaintiff not to stop, look, and listen, but apparently on the ground that it was negligence *per se*, measured by the "standard of conduct . . . applicable to all persons," not to have seen the train. Neither upon the facts nor the principle laid down is the case authority here.

This brings us to consider appellant's contention that the instructions complained of were proper under the circumstances of the case as shown by the testimony, to which attention is directed, and, further, that if any errors occurred in said instructions, such instructions, nevertheless, were more favorable to respondent than the law warranted, because, under the facts in evidence, the trial court should have directed the jury to bring in a verdict for appellant. Appellant also maintains that its motion for nonsuit made at the close of respondent's case should have been granted, and, therefore, any error in instructions thereafter given would not constitute prejudicial error.

The first or preliminary question is whether upon the testimony we have set out the trial court should have granted appellant's motion for a nonsuit at the close of respondent's case, and the second question is whether the trial court should have directed the jury to render a verdict for appellant on the ground that respondent was guilty of contributory negligence as matter of law.

[14] We think the motion for nonsuit was properly denied. The testimony we have summarized was sufficient upon which to base a verdict that the negligence of appellant was the proximate cause of the accident, and the question should, therefore, have been submitted to the jury. (*Scott* v. *San Bernardino etc. Co.*, 152 Cal. 604, 613 [93 Pac. 677] ; *Mann* v. *Scott*, 180 Cal. 550, 554 [182 Pac. 281].) And, as we have shown, the deceased was not required to stop, look, and listen. The remaining question, whether, apart from that rule, she was otherwise guilty of culpable negligence which was the proximate cause of the accident, should also have been submitted to the jury with appropriate instructions as to the

proper degree of care persons who make use of the accommodations provided by an interurban railroad company should use in entering upon the tracks of such company for the purpose of becoming a passenger on the cars.

[15] On the question whether the court should have directed a verdict for appellant it has been held "that the court may direct a verdict for the defendant where the evidence is undisputed or is of such conclusive character that the court, in the exercise of a sound judicial discretion, will be compelled to set aside a verdict returned in opposition to it." (*Davis* v. *California Street C. R. R. Co.*, 105 Cal. 131 [38 Pac. 647]; see, also, *Estate of Baldwin*, 162 Cal. 471 [123 Pac. 267]; 38 Cyc., p. 1565.) The evidence we have referred to, considered in connection with our discussion of the rule of stop, look, and listen, and the necessity of having the jury determine the hypothetical questions of fact, make it clear that the motion should have been denied.

[16] When the appellant undertook to establish on its own property a station and station grounds at the point in question it became charged with the duty of providing such accommodations as would afford safety and protection to its passengers in the use thereof. (See *Green* v. *South San Francisco etc. Co.*, 181 Cal. 392 [184 Pac. 669].) As we have stated the waiting-room provided by the appellant was inclosed on three sides and without windows. The approaching car could not be seen from within the room and could only be seen by leaning forward from within and peering beyond the blind wall or by stepping out from the inclosure into the narrow space provided. The motorman of the southbound car testified that the deceased took only one step from the station and while in that position was struck by the bumper of the car. He also testified that he stopped the car only when he saw someone waiting to board it. The witnesses for appellant testified that anyone inside the station could not be seen by the motorman operating the car entering the station grounds. In order, therefore, that a waiting passenger be visible to such motorman the passenger must step into a space which the evidence shows was a position of danger. The extent of the invitation by appellant to its passengers to enter and use the station and station grounds as they were used by the deceased under the cir-

cumstances here shown and the extent of the opportunity afforded the deceased to exercise care for her own protection in her employment of the facilities provided by the appellant, together with the other facts shown to exist at the time of the accident, all had a bearing on the question whether the deceased was guilty of contributory negligence. These considerations presented questions of fact for the jury to determine and from which it cannot in our opinion be said that contributory negligence was established as a matter of law.

[17] The motion for a new trial was properly granted. Order affirmed.

Richards, J., Shenk, J., and Seawell, J., concurred.

MYERS, C. J.—I dissent. Conceding that some of the instructions given were erroneous and that the error was prejudicial, the consideration of this appeal is reduced to the single question, ''Was the evidence herein legally sufficient to support a verdict in favor of plaintiff?'' If it was the trial court was justified in granting the new trial and the order should be affirmed. If it was not the trial court should have directed a verdict for the defendant, and any error in the instructions would, therefore, be immaterial and would not justify the granting of a motion for new trial. It is my conclusion that the undisputed evidence herein shows the decedent to have been guilty of contributory negligence as a matter of law and that for this reason the order granting the new trial should be reversed. I do not predicate this conclusion in the least upon the so-called ''stop, look, and listen rule,'' which is discussed at length in the prevailing opinion. To my mind that rule is a false quantity in this case, and I am willing to concede at the outset that it has no application herein.

I recognize the existence of the so-called ''railroad station rule'' and that its effect, when applicable, is to increase the *quantum* of care required of the railroad company, and to correspondingly decrease the *quantum* of care required of the passenger, but I question the applicability of this rule to the situation here under consideration. It is to my mind a misnomer to speak of the building referred to in the testimony herein as a ''railroad station.'' It consisted solely of

three walls and a roof. It was nothing more than a shelter where intending passengers and others might seek protection from the weather. It seems inaccurate to speak of this as "the usual stopping place of the cars." It is shown by the undisputed testimony that cars stop here only on signal from a passenger desiring to alight or from an intending passenger desiring to board a car, and that decedent had given no signal or intimation of her intention to board a car. It is alleged in the complaint herein and denied in the answer that there was at the place of the accident a sign reading "Cars Stop Here." There is no evidence in the record tending to prove this allegation and it must, therefore, be taken to be untrue. I agree that it is not necessary in order to constitute a station that it should have baggage-room, ticket offices, company employees, etc., and concur in the definition approved in the prevailing opinion "that the word 'station' would cover any place where trains usually and ordinarily stop." It seems clear to me that this is the broadest and most inclusive definition which can justly be used in considering the applicability of the "railroad station rule" as affecting the *quantum* of care to be exercised by railroad companies and their passengers. This must be so because the foundational reason for the "railroad station rule," which requires greater care from the railroad company and less from the passengers, rests upon the very fact that trains usually stop there, and that passengers are entitled to rely to some extent upon that custom. The place where this accident occurred was not such a place. It is true that the supreme court of Arkansas, in *Daniel* v. *Doyle,* 135 Ark. 547 [204 S. W. 210], said that the word "station" includes a flag station, but if the opinion in that case is examined it will be found that the language there used is wholly inapplicable to the question here under consideration, and should not be regarded as authority herein.

The facts disclosed by the undisputed testimony are that there was a space of six feet between the "station" and the nearest railroad track, leaving a clear space of at least three feet between the "station" and the overhang of the car; that the decedent proceeded from a position of safety across the intervening clear space immediately in front of the on-coming car and so close thereto as to be unavoidably struck thereby, without either looking or listening, and that if she

had looked she could not have failed to see, and if she had listened she could not have failed to hear the approaching car. As was said by this court in the case of *Kauffman* v. *Machin Shirt Co.,* 167 Cal. 506 [140 Pac. 15]: "It is true that ordinarily the question of contributory negligence is one largely of fact for the consideration of the jury, but where the standard of conduct required of persons under given circumstances has been plainly neglected by the person seeking relief, it then becomes a question of law." The prevailing opinion concedes that in the cases of *Klusman* v. *Pacific Electric Ry. Co.,* 190 Cal. 441 [213 Pac. 38], and *Ross* v. *Pacific Electric Ry. Co.,* 39 Cal. App. 658 [179 Pac. 538], the injured person in each case was guilty of contributory negligence as a matter of law, but refuses to apply that conclusion to what appear to me to be precisely equivalent facts in the instant case. In the Ross case the act of negligence which precluded recovery was the plaintiff's act in proceeding from a place of safety across an intervening clear space of forty-three inches in front of an approaching car, without looking or listening therefor. The difference between the two cases is the difference of seven inches in the width of the intervening space. In the Klusman case the injured plaintiff was not so utterly negligent as was the decedent in the case at bar. Mrs. Klusman did look in one direction for an approaching car before stepping so close to the track as to be in danger, but she did not look in the other direction for the approach of a car because, as she testified, she did not know that cars ran both ways on that track. This court was unanimous in that case in holding that "If the plaintiff knew that cars were operated on the middle track in both directions she was bound in the exercise of ordinary care to look in both directions before stepping upon the track. If she did not know that cars were operated in both directions upon the middle track she was negligent in assuming that cars were only operated in one direction without taking the precaution to look in the other direction as well. From either point of view the conclusion of the trial court that she was guilty of negligence as a matter of law was correct." The prevailing opinion herein seems to conclude that these cases are rendered inapplicable by the circumstance that the accidents there involved occurred at street intersections. If we were here considering

questions of negligence and contributory negligence as related to the duty of a railroad company to keep its station *premises* in a safe condition as to the floors and platforms thereof, a distinction could well be drawn between a case involving an accident on premises owned by the railroad company and one occurring in the public highway where the premises are not under the exclusive control of the company. But we are here considering the question of the correlative duties of the railroad company to exercise the highest degree of care *in the operation of its trains* for the safety of its passengers and intending passengers, and of the passengers to exercise ordinary care for their own safety. One of the reasons supporting the ''railroad station rule'' is that when a railroad company invites passengers to cross its tracks in boarding or leaving its cars it thereby assumes the duty of exercising the highest care in the operation of its cars upon such tracks for the protection of those passengers, and that such passengers have a right to rely to some extent upon its performance of that duty. I cannot see that this duty is either increased or decreased by the circumstance that an intersecting highway may cross the tracks at or near the point in question. I am convinced that if the ''railroad station rule'' is applicable in the instant case it was equally applicable, and to like extent, in the Klusman and Ross cases. As a matter of fact, the location of the accident in the Klusman case partook more of the character of a railroad station and station premises than in the case at bar, because it was the terminus of two of the three railway tracks at that place. The ''railroad station rule'' was formulated and applied in cases involving accidents which occurred at conventional railroad stations at which trains do usually and ordinarily stop. The reason for the rule is that a passenger or intending passenger at such a station may justly expect that if a train is approaching it will be in the process of coming to a stop, and will come to a stop, at the station, and that its approach, therefore, will not create such a dangerous situation as is involved in the approach of a train or car at other places. To apply this rule to a place at which trains do not usually and ordinarily stop, merely because the same is called a ''station,'' would seem to me to be an unwarranted extension of the rule. Even if it be assumed that the ''railroad station rule''

is properly applicable to the present situation, the fact remains that the duty rested upon the decedent at all times to exercise ordinary care for her own protection. While the *quantum* of care requisite to constitute "ordinary care" varies with the circumstances, it seems to me that it must, under the circumstances here shown, amount to something more than zero, and it appears to me from the evidence herein that the decedent exercised no care whatsoever, not even the slightest.

Lennon, J., and Waste, J., concurred.

Rehearing denied.

Myers, C. J., Lennon, J., and Waste, J., dissent from the order denying a rehearing.