[Civ. No. 6265. Second Appellate District, Division Two.—December 24, 1929.]

KATHERINE ROBBINS, Appellant, v. SOUTHERN PACIFIC COMPANY (a Corporation) et al., Respondents.

Hewitt, Ford, McCormick & Crump and Frank J. Barry for Appellant.

W. I. Gilbert for Respondents.

BURNELL, J., *pro tem.*—This being an appeal from a judgment of nonsuit it is unnecessary to review the evidence except in so far as it tends to establish facts favorable to appellant's contention that the death of her husband was caused by respondents' negligence. With this thought in mind and ignoring all contradictory evidence we may thus state the situation as it was presented to the court below on respondents' motion for a nonsuit:

The accident which resulted in the unfortunate death of Joseph M. Robbins occurred at 6:05 P. M. of February 24, 1926, at Prestolite Crossing, a public thoroughfare in the city of Los Angeles. At this point the Southern Pacific maintains four lines of railroad tracks running in an easterly and westerly direction which are crossed by an oiled rock road. On the night in question the deceased was driving a Dodge truck, towing a Chevrolet car, in a northerly direction along the above-mentioned road when his truck was struck by a Southern Pacific locomotive running from west to east on the third track from the south and driven by respondent Baker, an engineer in the employ of respondent railroad company. View of the tracks was obstructed by box-cars, of which there were four on the first or southerly track to the west of the road, the nearest being from twelve to fifteen feet to the left of the deceased as he approached the crossing, while there were about fifty of such cars on the second track, so that it was impossible to see the third and fourth tracks at all. These facts were testified to by the witness Cunningham, who was riding on the truck with the deceased. The same witness also swore that he heard no whistle blown or bell sounded as the truck approached the crossing, that there "was not any headlight from the engine showing down the road," and that he was positive that the headlight was not lighted. No "wigwag" or automatic signal was maintained at the crossing at the time of the accident, but a watchman, the respondent O'Dell, was employed by the railroad company whose duty it was "to stop traffic whenever a train would

come—automobiles that crossed the Prestolite Crossing.'' At the time of the accident he had been so employed for the past seven months.

Robbins was familiar with the crossing, having frequently driven across the tracks over the same road which he traveled on the night in question. On this point Cunningham testified: ''I had known the deceased the last several months; had ridden with him often; sometimes two or three times a week, and sometimes not so often; and had ridden over the same road with him often before, two or three times a week, for seven months, but not every week; sometimes I might go a couple of weeks and maybe I wouldn't see him for three weeks after that; had crossed with him there at this place sometimes in the evening several times.'' As the deceased and Cunningham approached the tracks at a speed of between four and six miles per hour—so slowly, indeed, that the watchman testified he thought the truck had stopped—the watchman was standing in the crossing, between the rails of the fourth or northerly track, facing the Dodge truck, ''with the lanterns back of his legs.'' His instructions were to halt traffic on the approach of trains at night by swinging a red lantern held in his left hand with the arm in a horizontal position while a white lantern, held at his right side, remained motionless, but on this occasion he gave no signal whatever of the approach of the engine. The deceased had driven the truck across the first and second tracks when Cunningham saw the engine bearing down upon them, and with an exclamation of warning to his doomed companion, jumped from the truck an instant before the engine struck it. The speed at which the locomotive was being driven was such that after the impact ''it kept on going. for some 900 feet and at a speed of 35 or 40 miles per hour.'' Measurement of the skid marks on the rails showed them as extending 532 feet from the crossing. The truck was carried about ninety feet east of the crossing and was ''all smashed to pieces'' and the driver so badly injured that he died the same night. Cunningham further testified that he was not watching the deceased at the time of the accident, but that as they were traveling toward the tracks he himself ''looked up the track to see if any train was coming,'' but could not see up the track, and that he also looked when they reached

the first track and when they were between the first and second lines of track and just as they were about to cross the third. The watchman's testimony was to the effect that he was blinded by the lights on the truck—"couldn't see what it was doing"—and thought it had stopped.

From the statement made by the trial judge in ruling on the motion for nonsuit, which statement is incorporated in the supplement to appellant's opening brief, it is evident that the motion was granted on the theory that the evidence disclosed that the deceased was guilty of contributory negligence as a matter of law, and it is upon this theory that respondents urge an affirmance of the judgment. In support thereof they direct our attention to certain well-established principles of law to which we shall now advert.

■ The tracks of a steam railroad are in and of themselves a warning of danger, and it is the duty of one approaching them to take every reasonable opportunity to look and listen before attempting to cross them (*Hutson* v. *Southern Cal. Ry. Co.*, 150 Cal. 701 [89 Pac. 1093]; *Holmes* v. *South Pacific Coast Ry. Co.*, 97 Cal. 167 [31 Pac. 834]; *Green* v. *Los Angeles etc. R. R. Co.*, 143 Cal. 37 [101 Am. St. Rep. 68, 76 Pac. 719]; *Herbert* v. *Southern Pac. Co.*, 121 Cal. 227 [53 Pac. 651]). ■ If the view of the tracks is obstructed a greater *quantum* of caution is demanded (*Herbert* v. *Southern Pac. Co., supra; Griffin* v. *San Pedro etc. R. R. Co.*, 170 Cal. 772 [L. R. A. 1916A, 842, 151 Pac. 282]; *Chrissinger* v. *Southern Pac. Co.*, 169 Cal. 619 [149 Pac. 175]); and if the obstruction is such as to prevent a view up and down the tracks without coming to a full stop, and *if necessary* alighting from his vehicle, then it is the duty of one about to cross such tracks to do these things (*Murray* v. *Southern Pac. Co.*, 177 Cal. 1 [169 Pac. 675]).

■ Nor does the failure of those in charge of a train to give the customary or law-demanded signal, as by blowing the whistle or sounding the locomotive bell, absolve him from his duty to use ordinary care for his own protection (*Stefanich* v. *Payne*, 54 Cal. App. 210 [201 Pac. 940]; *Hutson* v. *Southern Cal. Ry. Co., supra*); and the same is true as to the absence of a flagman at a point where one is usually stationed (*Stefanich* v. *Payne, supra*).

■ Indeed, it may be stated as a general rule that the adoption by a railroad company of safety devices or its maintenance of flagmen for the protection of the public never releases the individual from the obligation of exercising ordinary care for his own protection, although the *quantum* of care which will be reasonable may be less where the company maintains such safeguards than where it does not. (*Koch* v. *Southern Cal. Ry. Co.*, 148 Cal. 677 [113 Am. St. Rep. 332, 7 Ann. Cas. 795, 4 L. R. A. (N. S.) 521, 84 Pac. 176].) ■ On the other hand, it is equally well settled that the duty to stop, look and listen is not an absolute one but rather one the exercise of which is dependent on the particular conditions obtaining at the time (*Hoffman* v. *Southern Pac. Co.*, (Cal. App.) 279 Pac. 474; *Whitney* v. *Northwestern Pacific R. R. Co.*, 39 Cal. App. 139 [178 Pac. 326]), and that "if there is reasonable cause to believe there is no danger it is not negligence *per se* not to stop, look or listen." (*Wilkinson* v. *United Railroads*, 195 Cal. 185 [232 Pac. 131, 135].) ■ In the case just cited it is also held that one of the circumstances which will excuse a failure to look and listen is "where one has entered on the crossing under an express or implied invitation of the company's employees giving reasonable assurance of safety." Such assurance of safety may consist of raised traffic bars, of open gates where such devices are maintained at crossings or of the absence of a watchman or flagman at a crossing where one is usually stationed when trains are approaching. (*Wyseur* v. *Davis*, 58 Cal. App. 598 [209 Pac. 213]; *Gregg* v. *Western Pac. R. R. Co.*, 193 Cal. 212 [223 Pac. 553]; *Pennsylvania R. R. Co.* v. *Stegemier*, 118 Ind. 305 [10 Am. St. Rep. 146, 20 N. E. 843]; *Elias* v. *Lehigh Valley R. R. Co.*, 226 N. Y. 154 [123 N. E. 73]; *Hooper* v. *Boston & Maine Ry. Co.*, 81 Me. 260 [17 Atl. 64].)

*Pennsylvania R. R. Co.* v. *Stegemier, supra,* which is cited and relied on in *Wyseur* v. *Davis, supra,* was a case where a pedestrian attempted to cross a railroad track over a public street in the city of Fort Wayne. The gates were open at the time and the flagman was in his shed, but he gave no warning. It was held that under the circumstances it could not be said, as a matter of law, that the pedestrian was guilty of contributory negligence in attempting to cross

without taking the precautions usually required to discover approaching trains, and the court said: ''The case at bar is to be discriminated from those in which the injured person enters upon a track where there is no affirmative assurance of safety, for here the fact that the gates were up and no warning given by the flagman was an affirmative assurance of safety, upon which a citizen might act without being chargeable with negligence. This case is essentially unlike one where the only negligence is the mere failure to sound a whistle or ring a bell, for here the assurance was that there was no train near the crossing. This assurance constitutes the distinctive feature of this class of cases, for the reason that it is in the nature of an invitation to cross and of a declaration that there are no approaching trains.''

In the final analysis the test of negligence, as applied to one about to cross a railroad track the view of which is obstructed, should be: Would a reasonably prudent person, situated as the individual under consideration was situated and seeing what he then saw, have been justified in acting upon appearances as it may be assumed he did? If reasonably prudent men might disagree as to whether ordinary care was exercised in the premises the question should be left for the jury to determine (*Hoffman* v. *Southern Pac. Co., supra; Gregg* v. *Western Pac. R. R. Co., supra*). On a motion for nonsuit ''every favorable inference fairly deducible and every favorable presumption fairly arising from the evidence adduced must be considered as facts proved in favor of the plaintiff'' (*Gregg* v. *Western Pacific R. R. Co., supra*), and the fact that the deceased had frequently crossed over the tracks at Prestolite Crossing during the seven months preceding the accident, during all of which period of time the flagman had been stationed there to warn traffic of approaching trains, might fairly raise the inference that he knew that a flagman was kept there by the company whose duty it was to so warn the public. Seeing the flagman there as he approached and was about to cross the tracks, and noting that instead of giving the customary signal as hereinabove described the man stood motionless, facing the truck and with his lanterns held back of his legs, had the deceased not a right to assume that the danger of which the swinging red

lantern usually gave warning was absent? Did he not "enter on the crossing under an . . . implied invitation of the company's employees giving reasonable assurance of safety"? To answer these questions in the negative is to hold that as a matter of law one who places his trust in the instrumentalities provided by a railroad company for the protection of the public is guilty of contributory negligence if they fail to give warning of impending danger or death. This is not the law. A case which well illustrates the true rule is that of *Hooper* v. *Boston & Maine Ry. Co.*, *supra.* There the deceased and others were riding slowly at 10 o'clock at night toward a railroad crossing. They heard a whistle, but were uncertain whether it was from the road ahead of them or from another quite near. The gate at the crossing, though usually attended when trains were passing, was open, and no flagman was near. The view of the approaching train was obstructed, and the deceased drove on and was struck by it. It was held that judgment against the railroad company for the death of the deceased would not be reversed for contributory negligence, and the court said: "Clearly the gates must be tended, or they become false signals and lead the traveler into the very danger against which they were intended to guard him. Open gates invite passing; closed gates forbid passing. And by these signals thousands of travelers are governed every day. And, as gatemen usually perform their duties with fidelity—as much so as conductors, or engineers, or switchmen—we think it would be a wrong to them, as well as to travelers, to hold that everyone who trusts them is guilty of a want of ordinary care. It would not be true. Ordinarily, the great mass of the community do trust them. And, so far as we can discover, it has never been held by any court that to trust them is a want of ordinary care. The contrary has been held in many cases. A collision at a railroad crossing is *prima facie* evidence of negligence on the part of the traveler. But the inference of negligence may be repelled. And we think that an open gate and an obstructed view may be sufficient for this purpose. Certainly they are sufficient to bring the question within the province of the jury to decide, and prevent a nonsuit, or the setting aside of the verdict, if the jury find in favor of the traveler."

In *Elias* v. *Lehigh Valley R. R. Co.*, a case to which we have already adverted, the situation was similar in many ways to that in the instant case. There the driver of a sleigh was injured by collision with a train at a road crossing. There was evidence that a flagman stationed at the crossing was in his shanty at the time of the accident and gave no signal of warning to the driver as he approached the tracks. The court there said: "Where, although not required so to do, a railroad has stationed flagmen at a crossing, that fact, as to one who knows it and has come to rely upon it, may be considered by a jury in deciding whether under all the circumstances he has used reasonable care for his own protection. The absence of such a flagman may well affect the vigilance they would otherwise have required of an approaching traveler. As to the defendant's negligence, it is true that no flagman need have been stationed at this point. Having voluntarily placed one there, the defendant could later withdraw him. Its duty was done if it gave reasonable warning of the passing of its trains, and often the bell and whistle would, as a matter of law, be sufficient. Not always, however. Where the practice of guarding the crossing was not abandoned, where it was neglected by him whose duty it was to warn travelers, his unexplained failure might be found to be negligent towards those who knew of his habitual presence and had become accustomed to his warnings. The danger is obvious. It is like in kind to that caused by raised and untended gates. To some extent it is an assurance that the way is safe."

In the instant case respondents urge the lack of any positive evidence to prove that the deceased anticipated the presence of the flagman, or that he saw him, or that he relied on him to give warning of the approach of trains. The first of these objections has been covered by what we have said as to the inference to be drawn from the fact of deceased's familiarity with the crossing; the second may be disposed of by reference to the testimony of Cunningham that the flagman was on the crossing, facing the truck and therefore in full view of Robbins as well as of the witness who was seated by his side, and by the fact that if Robbins was guilty of negligence in not looking ahead that was something the burden of proving which lay on the de-

fendants under their affirmative plea of contributory negligence (*Dawson* v. *San Diego Elec. Ry. Co.*, 82 Cal. App. 141 [255 Pac. 215]), and that there was no evidence that he was *not* keeping a lookout ahead. To this may be added the application of the principle that where death has resulted from an accident and the lips of the injured party are thus sealed it will be presumed, in the absence of evidence to the contrary, that he exercised ordinary care for his own safety (*Larrabee* v. *Western Pac. R. R. Co.*, 173 Cal. 743 [161 Pac. 750])—in this instance consisting at least of looking ahead of his vehicle as he approached the tracks—and the further presumption that a person of normal sight and hearing "must have seen and heard that which was within the range of his sight and hearing" (*Billig* v. *Southern Pac. Co.*, 192 Cal. 357 [219 Pac. 992, 995]). Manifestly, as to the third objection, no testimony could have been adduced as to whether or not deceased relied upon the flagman to warn him of danger, as only Robbins could have told what was in his mind; but here again we think it may well be inferred, at least with respect to a motion for nonsuit, that knowing a flagman was stationed at the crossing, and seeing him there as he was about to drive across the tracks, and observing that he gave no signal, Robbins relied on these facts as an indication of lack of danger. There is most certainly no evidence that he did not rely upon them.

 It is only when but one conclusion can be reasonably drawn from the evidence on the question of contributory negligence that the question becomes one of law for the court to determine. Even in the absence of conflict in the evidence contributory negligence is a mixed question of law and fact which should be left to the jury if different conclusions upon the matter may rationally be reached from the evidence adduced (*Murray* v. *Southern Pac. Co., supra; Young* v. *Pacific Elec. Ry. Co.*, 208 Cal. 568, 279 Pac. 438; *House* v. *Meyer*, 100 Cal. 592 [35 Pac. 308]; *Whitney* v. *Northwestern Pac. R. R. Co.*, 39 Cal. App. 139 [178 Pac. 326]; *Katz* v. *T. I. Butler Co.*, 81 Cal. App. 747 [254 Pac. 679]; *Dawson* v. *San Diego Elec. Ry. Co., supra*). The rule is thus stated in *Peak* v. *Key System Transit Co.*, 88 Cal. App. 354 [263 Pac. 578, 582]: "In order that this court could determine as a matter of law that respondent

(appellant here) was guilty of contributory negligence it must be clearly shown from the undisputed facts, judged in the light of common knowledge and experience, that a party has not exercised such care as men of common prudence usually exercise in positions of like exposure (*Nehrbas* v. *Central Pac. R. R. Co.*, 62 Cal. 320). The evidence against the plaintiff should be so clear as to leave no room for doubt, and the facts such that the inference is irresistible, to justify this court in determining, as a matter of law, plaintiff guilty of contributory negligence (*Schneider* v. *Market Street Ry. Co.*, 134 Cal. 487 [66 Pac. 734]; *Schurman* v. *Los Angeles Creamery Co.*, 81 Cal. App. 758 [254 Pac. 681])."

Under the state of facts presented by the evidence adduced on behalf of the plaintiff in this case we are of the opinion that the court below should have left it to the jury to determine whether, under all the circumstances disclosed by the proof, Robbins acted as an ordinarily prudent man might have been expected to act, knowing what he knew and seeing what he saw—in other words, whether or not he used reasonable care for his own protection.

The judgment is reversed.

Craig, Acting P. J., and Thompson (Ira F.), J., concurred.

A petition for a rehearing of this cause was denied by the District Court of Appeal on January 22, 1930, and a petition by respondents to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on February 20, 1930.

All the Justices present concurred.