[Civ. No. 6736. First Appellate District, Division One.—April 4, 1929.]

LENA B. GIANNINI et al., Minors, etc., Respondents, v. SOUTHERN PACIFIC COMPANY (a Corporation) et al., Appellants.

L. L. Cory for Appellants.

Everts, Ewing, Wild & Everts, Dan H. Conway and C. M. Ozias for Respondents.

CAMPBELL, J., *pro tem.*—This is an appeal from a judgment entered upon the verdict of the jury awarding plaintiffs thirty thousand dollars damages for the death of Pete Giannini, which occurred in a crossing accident on September 15, 1925, near Kingsburg, in Fresno County. The action was brought by Lena Giannini, the surviving wife of Pete Giannini, on her own behalf, and as guardian *ad litem* of their two children, Leroy Giannini and Eugene Giannini. It is one of those unfortunate occurrences which arise by reason of the failure of automobile drivers to appreciate the danger involved in crossing railway tracks without observing the duty imposed upon them by law to stop, look and listen before proceeding upon such tracks —which are themselves signs of danger.

The scene of the accident was near the packing-house of the Kingsburg Fruit Growers. At this point the state highway runs approximately north and south. To the east and parallel with the state highway is the main line of the Southern Pacific Company through the San Joaquin Valley, connecting San Francisco and Los Angeles. To the west of the state highway is a spur-track of the railway company maintained for the purpose of affording railway service to certain packing-houses located along its line. A driveway running west from the state highway gives access to two packing-houses: one the Kingsburg Fruit Growers, which is west of and adjacent to the spur-track and north of the driveway, and the other the Alamo Packing Company, which is west of and adjacent to the spur-track and south of the driveway. The north and south distance between these two packing-houses is approximately forty-eight feet, of which twenty-three feet is taken up by the driveway. This driveway ends at the westerly lines of the two packing-

houses, and at this end of the driveway there is space within which automobiles may turn around. At the time of the accident the north half of the crossing was graveled and in the south half the ties projected above the roadway. The accident occurred where this driveway crosses the spur-track.

The decedent was a fruit grower, packer and shipper, who owned and operated a packing-house in the vicinity and who on numerous occasions had visited for business purposes the packing-house of the Kingsburg Fruit Growers and was familiar with the locality and the driveway and the road across the spur-track where the accident occurred, which spur-track was used in switching cars on an average of twice daily during the season. The deceased was a man about thirty years of age at the time of his death, in full possession of his faculties and in good health. Immediately preceding the accident and as the decedent was approaching the spur-track, driving his automobile slowly, a Southern Pacific locomotive was backing in a southerly drection along the spur-track opposite the Kingsburg Fruit Growers packing-house, pushing a water car. The engineer and fireman were in their proper positions in the locomotive, the engineer at the right—the opposite side from which decedent approached the track—and the fireman at the left, and on the stirrup at the front or southerly end of the water car was a brakeman watching out for the crossing.

According to the testimony of F. G. Anderson, an eye-witness to the accident, called by plaintiffs, and upon whose testimony plaintiffs rely and who at the time was in his automobile with his two children, the decedent was driving a light six Studebaker touring automobile; that just prior to the time of the collision both his own automobile and the automobile of decedent were parked side by side, both facing westwardly at a point southwesterly from the Kingsburg Fruit Growers packing-house, and that both he and the decedent had been inside that packing-house discussing business affairs; that after being in this packing-house for about ten or fifteen minutes they came out of the building together and they walked over to and entered their respective automobiles; that it was between 5 and 6 o'clock P. M.; that the automobile of the decedent was closest to the Kingsburg Fruit Growers packing-house, and that the decedent got into his car, turned it around, and drove east toward the

state highway on the graveled driveway along the southerly side of the Kingsburg Fruit Growers packing-house, crossed over the weighing scales with the two left wheels of his car; that the automobile did not change its speed nor swerve, but went straight ahead on to the track; that as the decedent approached the track he (the witness) was about to make the turn in his own car in like manner as the decedent had done; that he looked around and saw the car of decedent was just about on the first two rails; that he saw the train was moving toward decedent; it was then about four or five feet from decedent's automobile; the railroad crossing had been filled in with gravel and was fairly smooth, that is, flush with the ties, and the automobile was just being skidded slowly and gently along until it struck some ties and then it just dumped right over or crushed right over; this threw it over on its side kind of in a slanting position, not right upside down with the wheels in the air or anything like that; that the witness jumped out of his car and was hollering and waving his hands and was over there about the time the train stopped; that when the train was backed a few feet they found Mr. Giannini's body sort of hanging in the top of the open car "at the bow—that is, the top covering or a sort of framework going up"; that some brains were found on the track close to the corner of the Alamo Packing Company's packing-house near where the automobile stopped and was righted after being pushed by the train, and that the automobile from the time it was struck by the train until it stopped must have been pushed thirty-five feet, possibly a little more.

The accident happened between 5 and 6 in the afternoon of a clear day. It was still broad daylight; the engine bell, according to the testimony of the train crew, was ringing, which testimony is corroborated by Ralph Anderson, who was riding in the automobile with his father, F. G. Anderson. As the decedent's automobile, proceeding at the rate of speed of four or five miles an hour toward the spur-track, came into view, and it seemed obvious that he did not see the train approaching—although he had ample opportunity to see it before going on to the tracks, had he looked—and that he was attempting to cross the track ahead of the train, the brakeman gave the emergency stop signal, jumped from the car and shouted to attract

decedent's attention. Despite these warnings decedent drove his automobile directly upon the spur-track in the path of the approaching train. It must be conceded that had he listened, he could have heard the bell and the noise of the locomotive and car, and that had he looked, he could have seen the approaching train in ample time to avoid the accident, and was therefore guilty of contributory negligence as a matter of law in driving upon the railway tracks (*Green* v. *Southern Pac. Ry. Co.*, 138 Cal. 1 [70 Pac. 926]; *Griffin* v. *San Pedro, Los Angeles & Salt Lake R. R. Co.*, 170 Cal. 772 [L. R. A. 1916A, 842, 151 Pac. 282]; *Murray* v. *Southern Pac. Co.*, 177 Cal. 1 [169 Pac. 675]; *Young* v. *Southern Pac. Co.*, 182 Cal. 369 [190 Pac. 36]; *Billig* v. *Southern Pac. Co.*, 192 Cal. 357 [219 Pac. 992]; *Thompson* v. *Southern Pac. Co.*, 31 Cal. App. 567 [161 Pac. 21]; *Bissett* v. *South San Francisco Belt Ry. Co.*, 67 Cal. App. 325 [227 Pac. 671]).

Respondents concede that decedent was guilty of negligence up to the time of the impact of the water car with his automobile; at least they present no argument to justify his conduct and cite no authorities in their brief on this issue, stating: "We shall not take up any considerable space in discussing the extent and degree that the decedent was guilty of negligence up to the point of time when the water car collided with decedent's automobile. Suffice it to say that his negligence up to that time was not as gross as contended for by opposing counsel," but rely entirely for support of the judgment on the doctrine of the last clear chance, asserting that the engineer was negligent—did not exercise ordinary care—in bringing his train to a standstill after the collision, and that the decedent met his death not at the point of contact, but where the automobile rested when it ceased being pushed over the ties beyond the graveled portion of the crossing, and where the brains were found on the spur-track.

It is apparent that since the deceased was driving his automobile very slowly and could have stopped within a few feet and since the approaching train was proceeding at not to exceed five miles an hour, the negligence of the deceased continued until the exact moment of the impact and that if the deceased met his death at that point, plaintiffs could not recover. Further, until this negligence of

the deceased terminated the doctrine of the last clear chance has no application; that "the rule which permits a recovery notwithstanding some negligence on the part of the plaintiff or person injured is only properly applied in those cases where such negligence was the remote and not the proximate cause of the injury—that is where the negligent acts of the parties were independent of each other" (*Holmes* v. *Southern Pac. Ry. Co.*, 97 Cal. 161, 169 [31 Pac. 834, 835]). It cannot be applied to a situation where the negligence of the deceased continued to the moment of the impact and actively contributed to his own injury. The deceased being actively and contemporaneously at fault until the moment of the collision, the respondents are barred from the right to recover for any act up to that time (*Green* v. *Los Angeles Ry. Co.*, 143 Cal. 41 [101 Am. St. Rep. 68, 76 Pac. 719]).

Respondents rely in support of their contention of appellant's want of ordinary care after becoming aware of decedent's danger and his inability to extricate himself from his position of peril on the testimony of the witness F. G. Anderson, who testified that the water car must have proceeded thirty-five feet from the time of the impact until it stopped, and that brains were found near where the automobile was righted, and the testimony of Joseph A. Keefer, a locomotive engineer, who, testifying as an expert, gave it as his opinion that considering the type of engine, equipped with Westinghouse brakes and also equipped with emergency brakes, the engine backing upon a dry day and the *rails and wheels being dry*, the track being level and the engineer in proper position to stop his engine and carrying eighty pounds of air, and the air on the water car being also connected with the air on the engine, and considering that the engine and water car were backing down that spur-track at a rate of speed between three and five miles an hour and the brakes in proper working condition, the train could have been stopped within ten feet after applying the emergency brakes.

It is the theory of respondents that the deceased did not meet his death at the time of the impact but at the point where the automobile stopped and the brains were found on the spur-track. It appears that while the automobile was crushed, everything in it, for aught the record shows, re-

mained intact until it was straightened up when the train was moved back. Nothing had fallen out and the body was hanging at the top or bow of the automobile. Respondents, therefore, in attempting to fix the time the deceased received the injuries which resulted in his death as being after the collision, can only rely upon the fact that brains were found at a particular point on the track, there being no direct evidence in the record as to when the deceased received his injuries—no evidence that his head was struck by or against anything from the time of the impact until he was found dead in the automobile. The evidence is just as consistent with the theory that the deceased received his injuries at the exact moment of the impact as it is that he received them at the time the train was brought to a stop. Deceased was sitting on the left-hand side of the automobile which was the side struck by the water car. His automobile was flush on the tracks at the time of the impact, and, therefore, the deceased himself was immediately opposite the water car and in close contact with it. From the time of the impact the speed of the train diminished until at the point where the brains were discovered it had stopped. There was not sufficient force when the wheels of the automobile came in contact with the exposed ties to completely overturn it; it was simply rolled over on its side. Much less force was then in operation than at the moment of the impact. The deceased was not found under the automobile, but his body remained in it when it was righted. No blood was found on the rails, according to the witness Anderson. There is no evidence to show that the deceased received his injury at the time the automobile was turned on its side. Blood and brains would as likely have been present where the automobile overturned had the deceased been injured at the moment of the impact, as though he had been injured at that spot. As to when the deceased was injured requires speculation, conjecture and surmise.

Under the doctrine of last clear chance upon which respondents rely—and necessarily must rely in order to recover upon the record here presented—the burden is upon them to show, if such be important, that the decedent received his injuries at the time the automobile overturned and not at the time of the collision, and "the facts upon which the liability of the defendant rests must be proved

by satisfactory evidence; they cannot be established by mere conjecture'' (*Reuter* v. *San Pedro, Los Angeles & Salt Lake R. R. Co.*, 37 Cal. App. 277 [174 Pac. 927]). ''If it appears that the facts and circumstances from which a conclusion is sought to be deduced, although consistent with that theory, are equally consistent with some other theory they do not support the theory contended for—*Wilbur* v. *Emergency Hospital Assn.*, 27 Cal. App. 751, 759 [151 Pac. 155, 158].'' (*Hopkins* v. *Heller*, 59 Cal. App. 447, 454 [210 Pac. 975, 978].) ''When the precise cause is left to conjecture, and may be as reasonably attributed to a condition for which no liability attaches as to one to which it does, then a verdict should be directed against the plaintiff'' (*Ryan* v. *Fall River Iron Works*, 200 Mass. 188 [86 N. E. 310] ; *Rosenbaum* v. *Luce*, 96 Cal. App. 149 [273 Pac. 862]). Here, as the decedent's brains were knocked out, it is apparent that his death was instantaneous, and that if he were not struck at the time of the impact, with the train moving at a rate of speed of from three to five miles an hour and the automobile being skidded slowly along and the deceased made no attempt whatever to place himself out of danger, his negligence continued and was concurrent with the negligence of the defendant, if defendant were negligent. The doctrine of last clear chance has no application to a situation where by mutual carelessness an injury ensues to one of two parties. In other words, the doctrine of last clear chance excludes from the operation of its underlying principle every case wherein it may be said that the negligence of the injured party was contemporaneous, concurrent, continuing and contributory with the negligence of the party inflicting the injury (*Gilbert* v. *Erie R. Co.*, 97 Fed. 747, 752 [38 C. C. A. 408] ; *Louisville etc. R. R. Co.* v. *Young*, 153 Ala. 232 [16 L. R. A. (N. S.) 301, 45 South. 238] ; *Green* v. *Los Angeles Terminal Ry. Co.*, 143 Cal. 31 [101 Am. St. Rep. 68, 76 Pac. 719] ; *Tobin* v. *Omnibus Cable Co.*, 4 Cal. Unrep. 214 [34 Pac. 124]). ''Obviously, if both parties to an accident could, by the exercise of ordinary care, have avoided it, neither can be said to have had the last clear chance'' (*Young* v. *Southern Pacific Co.*, 189 Cal. 746 [210 Pac. 259]). In the present case if the deceased were uninjured during the thirty-five feet in which, according to the testimony of the

witness Anderson, the automobile was slowly being pushed along by the train and he made no attempt whatever to extricate himself from his position of peril, such lack of action on his part constituted want of ordinary care.

As to the question of want of care on the part of appellants' employees it may be said that the testimony of the expert engineer, Joseph A. Keefer, that the train could be stopped in ten feet at the speed it was going after applying the emergency brakes, is of little or no value, as it is based upon the false hypothesis that the *rails and wheels were dry*, and the uncontradicted evidence is that the rails were wet and that the wheels slid a distance of eighteen feet after they were locked with the brakes. The opinion of an expert upon assumed facts so variant from those shown by the uncontradicted evidence cannot be given any probative force (*Estate of Purcell*, 164 Cal. 308 [128 Pac. 932]; see, also, *Hallowell* v. *Union Oil Co.*, 36 Cal. App. 685 [173 Pac. 177]; *Graves* v. *Union Oil Co.*, 36 Cal. App. 770 [173 Pac. 618]). Respondents call our attention to the fact that it was a clear day and that there was dust at the place of the accident. This statement "that there was dust at the place of the accident" is based on the testimony of the witness Anderson, who testified that he reached the scene of the accident a second or two after the train had come to a stop: "After the dust and things had cleared up then I seen the trainmen on the other side." This testimony that there was dust where the train stopped does not refute the positive testimony that the rails along the packing-house were wet and that at pressure under the weight of a train they sunk beneath the level of the water. Furthermore, a photograph presented during the argument in this court shows considerable water on the roadbed near the corner of the Kingsburg Fruit Growers packing-house, the ground being almost completely covered with water between the rails, and water standing on the outside of the rails on each side, and in at least two places the water is practically level with the top of the rail, indicating strongly that the wheels of the locomotive and water car must have been wet, and as further evidence and corroboration that the rails and wheels were wet is the undisputed fact that the train skidded eighteen feet after the emergency brakes were set, established by undisputed testimony and the marks

on the rails. The testimony of the train crew, which is uncontradicted, is to the effect that the engine bell was ringing as the deceased drove his automobile at the rate of four or five miles an hour toward the spur-track; that it seemed obvious that he was attempting to cross the track; that the switchman gave the engineer the emergency stop signal, jumped from the car and shouted to the deceased to attract his attention; that the engineer immediately applied the emergency brakes and did everything he could to bring the train, which was then proceeding at the rate of about five miles an hour, to a stop; that despite these warnings the deceased drove his automobile directly upon the spur-track in the path of the approaching train; that the engineer did not see the automobile until its hood had passed over the tracks and protruded beyond the water car; that the automobile was struck by the southerly end of the water car, pushed across the driveway, and as the wheels of the automobile struck the ties on the southerly half of the driveway and beyond the graveled portion, it was partially overturned and was on its side when the train was brought to a stop.

While all reasonable inferences are to be drawn from the evidence in favor of the conclusion of the jury and conflicts are to be resolved in favor of respondents, inferences cannot be drawn contrary to uncontradicted testimony and based upon imagination, speculation or supposition. The jury cannot shut its ears to the only testimony on the question and set up a standard of its own (*Vaca* v. *Southern Pacific Co.*, 91 Cal. App. 470 [267 Pac. 346]).

The last clear chance doctrine upon facts somewhat analogous to the situation presented here is discussed at some length in the recent case of *Bagwill* v. *Pacific Electric Ry. Co.*, 90 Cal. App. 114 [265 Pac. 517], in which it is said: "This doctrine presupposes that the plaintiff has been negligent; that as a result thereof he is in a situation of danger from which he cannot escape by the exercise of ordinary care; that the defendant is aware of plaintiff's dangerous situation under such circumstances that he realizes or ought to realize his inability to escape therefrom; that the defendant then has a clear chance to avoid injuring the plaintiff by the exercise of ordinary care and fails to avail himself of the opportunity so presented. If all these elements are

present the rule applies and enables plaintiff to recover, notwithstanding his own negligence; but if any of them be absent the rule does not apply, and the case is governed by the rules of negligence and contributory negligence (*Palmer* v. *Tschudy*, 191 Cal. 696, 700 [218 Pac. 36]; *Chappell* v. *San Diego & Arizona R. R.*, 201 Cal. 560 [258 Pac. 73]). . . . It would be and is a matter of common knowledge that even if we assume that thought and action were simultaneous on the part of the motorman, it would take a little time for the brakes to take hold after the motorman had operated whatever mechanical devices were employed to effect the braking. . . . Certainly the doctrine of last clear chance never meant a splitting of seconds when emergencies arise. There seems still to be some misconception of this doctrine of last clear chance. It was not devised as a last resort to fasten liability on defendants. Like the body of the law of negligence, to which the doctrine is appended, the test remains as that of ordinary care under all of the circumstances. The law in many of its workings indicates great charity and solicitude for individual rights. It says to a negligent plaintiff that in spite of his lack of caution he will be protected against wanton, wilful or avoidable harm. But on the other hand it penalizes no innocent person. We are not to tear down the facts of a case and rebuild the same so that, by a trimming down and tight-fitting operation, something can be constructed upon which may fasten the claim of last clear chance. The words mean exactly as they indicate, namely, last *clear* chance, not possible chance. The Supreme Court has not left us to speculate on the application of the doctrine (*Palmer* v. *Tschudy*, 191 Cal. 696 [218 Pac. 36]; *Young* v. *Southern Pacific Co.*, 182 Cal. 369 [190 Pac. 36]; *Wallis* v. *Southern Pacific Co.*, 184 Cal. 662 [15 A. L. R. 117, 195 Pac. 408]; *Gainer* v. *United Railroads*, 58 Cal. App. 459 [208 Pac. 1013])."

■ Here, upon authority as well as upon reason, the doctrine of last clear chance has no application to the established facts. That decedent was guilty of negligence in driving on to the track in the path of the approaching train, is conceded. As to where he received his injuries, whether at the point of impact or where the train stopped, the evidence is silent. If at the point of impact, clearly respondents cannot recover, and if where the train stopped

the burden was upon them to establish such fact and decedent's exercise of ordinary care in the interim. This burden they have failed to assume. The place where the injuries were received and the negligence of defendants' servants in stopping the train in time to avert the injuries, if received after the impact, can be determined only by speculation. Upon the evidence the court in our opinion erroneously instructed the jury that the doctrine of last clear chance applied. ▮ The giving of an instruction submitting an issue on the last clear chance, where there is not sufficient evidence to justify the submission of such issue, must be held fatally prejudicial (*Wallis* v. *Southern Pacific Co.*, 184 Cal. 662 [15 A. L. R. 117, 195 Pac. 408]).

The judgment is reversed.

Tyler, P. J., and Cashin, J., concurred.

A petition for a rehearing of this cause was denied by the District Court of Appeal on May 3, 1929, and a petition by respondent to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on June 3, 1929.