[Civ. No. 13259.   First Dist., Div. Two.   Sept. 30, 1947.]

JACK RATHER, a Minor, etc., Appellant, v. CITY AND COUNTY OF SAN FRANCISCO et al., Respondents.

Fitz-Gerald Ames for Appellant.

John J. O'Toole, City Attorney, Thomas C. Ryan and Geo. A. Helmer, Deputy City Attorneys, for Respondents.

GOODELL, J.—Appellant sued for damages for personal injuries. The verdict was in favor of the defendants, and from the judgment entered thereon this appeal was taken.

Appellant, a 10-year-old boy, was struck by a southbound interurban car of respondent municipality on its San Mateo line at Baden crossing (a signal-stop station) on October 5, 1944, at about 1 p. m., and suffered a fracture of each leg, head injuries and an injury to his right hand.

A northbound car reached Baden crossing shortly before the accident, and its movements bear somewhat on the factors of time and distance in this case. Appellant rode on the rear end of the northbound car, and three older boys, who were his companions, rode on the front end. All four boys were en route to the golf course at Baden, to caddy, which they had done on several afternoons a week for several months.

The three boys on the front end of the northbound car testified that as it approached the crossing they saw the other car on the southbound track at a distance of between 300 and 400 feet to the north, traveling at a speed of between 35 and 40 miles an hour. All three testified that just before they alighted at Baden crossing they again saw it, this time "just a few feet away," traveling at about the same speed. This testimony puts the southbound car almost opposite the northbound car when the boys alighted. One of the boys on the front testified that he saw the southbound car for the second time "just as it was passing the northbound car." Two of the boys got off the front end while the car was moving at from 3 to 5 miles an hour and ran alongside the car toward its rear end. The third boy alighted from the front end after it stopped, and followed them.

Appellant alighted from the rear end of the northbound car at Baden road while it was moving at from 3 to 5 miles an hour, ran around the rear end, stopped, and then started to cross the southbound track, whereupon he was hit by the southbound car. None of the other three boys saw appellant after he left the northbound car and before he was struck, but one of them saw him just as he was struck.

Appellant's testimony will be summarized in some detail. He testified that when he got off the northbound car he ran around behind it but "stopped around the back of the car" and "looked up [north, to his right] to see if another car was coming." He saw a car "between 250 and 300 feet" away, but could not tell its speed, and "I thought I had time to go

across, so I ran—went across—walked across." "Q. How far had you proceeded before you were hit? A. About a step and a half inside the southbound tracks," which is about where the southeasterly line of the Baden road crosses, diagonally, the southbound track.

He testified that he saw the car the second time, just before he was hit, "when it was about 50 feet away" and estimated its speed then at 35 or 40 miles an hour, judged "by the distance it traveled in such a short time." "Q. Did you make any attempt to jump out of the road? A. Yes, I did . . . I started to turn around to jump out of the way" but was unable to "because the car was traveling too fast and it hit me before I had time to get out of the way."

Appellant testified that on former occasions about one out of four or one out of three times he had seen southbound cars approaching Baden station as he got off northbound cars and "they always slowed down" to between 3 and 5 miles an hour; that he had this in mind on the day he was struck; and on such other occasions they had always rung the bell.

On cross-examination he admitted running fast around the rear end of the northbound car, but denied that he continued running across the southbound track. He knew these cars had an overhang of about 2 feet beyond the rails and testified that when he stopped and looked to the right he was at about the point of the 2-foot overhang. He was asked why, after running around the rear end of the car, he had stopped and walked across the rest of the track, and answered, "Because usually when I went that way the cars always slowed down, before, when they saw a car letting off passengers. Q. Didn't you figure you could get over that track quicker if you kept on running? A. No. Q. Did you think you could get over it quicker by walking? You didn't think that, surely, did you? A. No."

To the question "After you saw that car coming 250 or 300 feet away did you keep your eyes on it as you walked across the remaining distance?" appellant answered "No." "Q. You turned away from it? A. Yes. Q. Where did you look then? A. I looked straight ahead."

Appellant had testified that between the time when he stopped (and looked to the right and saw the car coming) to the time he was hit he had walked about 15 feet. He was then confronted with the admitted fact that the distance between the northbound and southbound tracks was 8 feet and that

if he had stood at the point of the 2-foot overhang when he looked to the right, the distance between him and the nearest rail ahead would be 6 feet, making a total of a little over 8 feet (as against 15) to the center of the southbound track. He replied that he "was walking diagonally across the road, from the edge, southerly edge of the road." "Q. And when you were in the middle [of the southbound track] and you looked the second time, the car was fifty feet away, is that right? A. Yes. Q. When you saw that car did you jump out of the way? A. No. Q. Did you walk out of the way? A. I started to get out of the way, but I never had time to get out of the way. Q. You started . . . jumping or running? A. I started to turn around. . . . Q. . . . when you saw it fifty feet away did you start to jump? A. No. Q. Did you start to run? A. No. Q. Did you start to walk? A. I just turned around." . . . "Q. Jackie, you say that you were walking diagonally across from the time you saw the car 250 or 300 feet away the first time, up to the time you got into the middle of the southbound tracks, is that right? A. Yes. Q. When you were walking diagonally you were walking away from the car, weren't you? A. Yes. Q. In other words, your back was toward the car, is that correct? A. Yes. Q. Your back was toward the car from all the time that you first saw it, 250 or 300 feet away, up until the time you looked the second time, is that correct? A. Yes."

Appellant's deposition was read to him as follows: "Q. When you got behind the car on which you had been riding you saw a southbound car about 250 feet away—is that right? A. Yes. Q. Was it going fast? A. I don't know. I couldn't judge the speed from there." He admitted so testifying.

There is, of course, much more evidence in the case than that just narrated, but for the purpose of the discussion of appellant's first and principal point we confine ourselves to the testimony of the appellant himself and that of his three companions, who were his witnesses.

The crossing at Baden was a place where cars stopped on signal. On the westerly side of the tracks there is a platform and on the easterly side a bench. The Baden road intersects the tracks at an angle of a little less than 45 degrees. That the southbound car came into the crossing at a high speed is not seriously disputed. When the motorman was asked how fast the car was "going on this particular day as you approached the Baden crossing?" he answered, "Well, after leaving South City junction, going up there, we

go between twenty-five and thirty miles an hour.'' The appellant and the other boys were thoroughly familiar with the crossing.

■ Appellant's principal contention is that the court erred in refusing to instruct on the doctrine of the last clear chance. He argues that the case was tried on that theory, and that ''A litigant requesting it is entitled to proper instructions presenting his theory of the case, based on the pleadings and proof . . .'' (citing 24 Cal. Jur., p. 826). That, of course, cannot be questioned, but it is likewise settled law that the giving of a last clear chance instruction in a case where there is not sufficient evidence to justify the submission of such issue, is fatally prejudicial error (*Wallis* v. *Southern Pacific Co.*, 184 Cal. 662, 672 [195 P. 408, 15 A.L.R. 117]; *Giannini* v. *Southern Pacific Co.*, 98 Cal.App. 126, 138 [276 P. 618]; *Erwin* v. *Morris*, 10 Cal.App.2d 168, 171 [51 P.2d 149]; *Johnson* v. *Southwestern Engineering Co.*, 41 Cal.App. 2d 623, 626 [107 P.2d 417].)

■ Any discussion of the last clear chance rule might well open with the statement that such rule presupposes that the plaintiff has been negligent. Appellant recognizes this rule.

■ According to appellant's testimony he was standing several feet from the southbound track when he looked to the north and saw the car coming from that direction.

In *Korchack* v. *Pacific Electric Ry. Co.*, 9 Cal.App.2d 89, 93 [48 P.2d 752], the court said:

''During all of the time that a pedestrian is approaching a railroad track he is in a position of absolute safety. The law is well established that an engineer or a motorman is not charged with knowledge that the pedestrian will change his position to one of peril, but he has a right to assume that the pedestrian will exercise his faculties of observation and caution, and will not remove himself from a place of safety and recklessly expose himself to danger, when it is obvious that with the slightest care he could stop and avoid the peril. (*Green* v. *Los Angeles Terminal Ry. Co.*, 143 Cal. 31 [76 P. 719, 101 Am.St.Rep. 68]; *Billig* v. *Southern Pacific Co., supra* [192 Cal. 357 (219 P. 992)]; *Basham* v. *Southern Pacific Co.*, 176 Cal. 320 [168 P. 359]; *Holmes* v. *South Pacific Coast Ry. Co.*, 97 Cal. 161 [31 P. 834]; *Green* v. *Southern Pacific Co.*, 122 Cal. 563 [55 P. 577]; *Choquette* v. *Key System Transit Co., supra* [118 Cal.App. 643 (5 P.2d 921)].)''

In *Johnson* v. *Sacramento Northern Railway*, 54 Cal.App. 2d 528, 534 [129 P.2d 503], this court said: "It is also significant to note that the 'situation of danger' or 'position of danger,' referred to in the authorities dealing with the last clear chance doctrine, is reached only when a plaintiff, moving toward the path of an oncoming train or vehicle, has reached a position 'from which he cannot escape by the exercise of ordinary care.' In other words, it is not enough, under the last clear chance doctrine, that plaintiff is merely approaching a position of danger, for *until he has reached a position of danger, he has the same opportunity to avoid the accident by the exercise of ordinary care, as has the defendant.* In such cases the ordinary rules of negligence and contributory negligence apply, rather than the exceptional doctrine of last clear chance. *It is only in cases in which, after plaintiff reaches a position of danger, defendant has a last clear chance to avoid the accident by the exercise of ordinary care, and plaintiff has no similar chance, that the doctrine is applicable.*" (Emphasis added.)

According to appellant's own testimony, after running, he came to a sudden halt, and then walked. Under the authorities just cited he was not in a position of danger until after taking but a few steps, he was on the southbound track. This obviously was a matter of but a second or two and gave the motorman not only no *clear* chance, but no chance at all, in which to act. The act creating the peril occurred "practically simultaneously with the happening of the accident." (See *Poncino* v. *Reid-Murdock Co.,* 136 Cal.App. 223, 232 [28 P.2d 932].)

Appellant invokes the rule that more care is required in cases of children of tender years than in the case of adults, because children act swiftly and impulsively. This case, however, has to do with the last clear chance rule, and whether the person in a position of peril on the track is a 10-year-old boy or an adult does not increase or decrease the duty of the motorman thus suddenly confronted. The life of a human being, of whatever age, is at stake, and under the rule the motorman must act at once if he has a *clear* chance to do so. His *opportunity* to act is no greater, nor his duty stricter, because the person in peril happens to be a child. His duty *at that time* is to exercise ordinary care in the emergency. The cases relied on by appellant (*Shannon* v. *Central etc. District,* 133 Cal.App. 124 [23 P.2d 769]; *Brizzolari* v.

*Market St. Ry. Co.,* 7 Cal.App.2d 246 [46 P.2d 783] ; *Scalf* v. *Eicher,* 11 Cal.App.2d 44 [53 P.2d 368] ; *Harrison* v. *Gamatero,* 52 Cal.App.2d 178 [125 P.2d 904]) are therefore not in point in connection with the motorman's duty to exercise ordinary care once the peril has arisen.

Appellant's contention that "Children of tender years are not chargeable in law with contributory negligence" is not consistent with his concession that there is substantial evidence to sustain the plea of contributory negligence in this case, nor in view of his definite statement that contributory negligence is an "issue which is not here involved."

Appellant argues that the passenger station rule (*Wilkinson* v. *United Railroads,* 195 Cal. 185, 198 [232 P. 131] ; *MacGregor* v. *Pacific Electric Ry. Co.,* 6 Cal.2d 596, 599 [59 P.2d 123]) is applicable to this case. The trial judge viewed the case that way, for in the course of appellant's testimony he said, "This is a station case, . . ." and he charged the jury accordingly. We view it the same way.

Appellant argues that "In considering the degree of the duty of the respondent motorman and the degree of care resting upon him, to exercise the last clear chance to avoid the accident, it is important to keep in mind the very high degree of care resting upon an interurban railway company and its employees when operating its trains or cars over its station premises."

What has just been said respecting the duty owed to children of tender years answers this contention as well. On the last clear chance question the inquiry is whether the motorman exercised ordinary care to avoid the accident after the emergency had arisen. Respondents' negligence in violating the passenger station rule was, admittedly, concurred in by appellant. It was only after appellant's negligence had intervened that he was in peril and it was then that the motorman's duty arose to exercise ordinary care to avoid the accident (if he could) under the changed circumstances then existing. As said above, a human life was at stake (because of the concurrence of appellant's negligence) and at that critical juncture it made no difference whether the imperiled pedestrian was on station grounds, or elsewhere.

There are scores of cases of pedestrians injured in crossing railroad tracks where the last clear chance rule has been invoked, but there is no point in citing them because of differing facts.

One of the leading cases on the general subject (a pedestrian-automobile case, not a railroad case) is that of *Palmer* v. *Tschudy*, 191 Cal. 696 [218 P. 36]. There the plaintiff, intending to cross the street at a right angle intersection, glanced to the north and saw defendant's automobile approaching southbound about 200 feet away; she started across, and after taking two or three steps, again glanced to the north and saw the automobile still approaching and, of course, nearer. She did not see it again until after the accident. The trial court submitted the case to the jury on the single issue of last clear chance. The jury returned a verdict for the plaintiff; the judgment was reversed. In that case the court restated the rule as follows:

"The last clear chance rule presupposes: That the plaintiff has been negligent; that as a result thereof she is in a situation of danger from which she cannot escape by the exercise of ordinary care; that the defendant is aware of her dangerous situation under such circumstances that he realizes, or ought to realize, her inability to escape therefrom; *that he then has a clear chance to avoid injuring her by the exercise of ordinary care, and fails to do so.* If all of these elements are present the rule applies and enables the plaintiff to recover, notwithstanding her own negligence. But if any of them be absent the rule does not apply and the case is governed by the ordinary rules of negligence and contributory negligence. The rule does not require that the inability of the plaintiff to escape the danger shall be due to a situation which renders it physically impossible for her to do so. It applies equally when she is wholly unaware of the danger and for that reason unable to escape it. *But the rule also requires that if she is aware of the danger, or becomes aware of it, she must thereafter exercise ordinary care for her own protection. If, being aware of the danger and able to escape it by exercising ordinary care, she neglects to do so, she cannot invoke the last clear chance rule to place the burden of the resulting loss upon the other party.* 'Obviously if both parties to an accident could, by the exercise of ordinary care, have avoided it, neither can be said to have had the last clear chance. It is only when a defendant charged with the negligent infliction of the injury, knowing plaintiff's peril, could, *and the injured plaintiff could not,* have avoided the injury that the defendant is liable. The liability is placed upon the party inflicting the injury only if immediately be-

fore the actual infliction of the injury the injured person was in such a situation as to be unable by the exercise on his part of reasonable and ordinary care to extricate himself, and vigilance on his part would not have averted the injury.' (*Young* v. *Southern Pac. Co.*, 189 Cal. 746 [210 P. 259].)'' (Emphasis added.) The court then said:

''Measuring the facts of this accident by the foregoing rules of law, it becomes apparent that they do not meet the requirements of the last clear chance rule. According to plaintiff's version, when in a position of safety, within three steps of the east curb, she saw the automobile approaching the spot which she intended to traverse. Then she proceeded to walk across the street in front of the approaching automobile without ever again looking at it or in the direction from which it was approaching. Can it be justly said, under these circumstances, that the defendant could, and the plaintiff could not, have avoided the injury? Undoubtedly, either one of them could have avoided it very easily. The defendant could have avoided it by bringing his automobile to a stop. Plaintiff could have avoided it by waiting until the automobile passed, or by keeping her eyes on it as she went forward and timing her steps so as not to pass in front of it so close as to be in danger. If her conduct in going forward in the manner in which she did was negligent, it was negligence which continued up to the very instant of the injury. 'This exception to the general rule [the last clear chance rule], however, has no application to a situation where by their mutual carelessness an injury ensues to one of two parties, both of whom are contemporaneously and actively in fault down to the very moment of injury.' (*Young* v. *Southern Pac. Co., supra.*)

''If we accept defendant's version, plaintiff stood in the middle of the street with her back to the approaching automobile, knowing that it was approaching her, without taking the slightest precaution for her own safety. If this was negligence it continued up to the instant of the injury. If the approach of the automobile under these circumstances did not create a dangerous condition, there is no basis for the application of the last clear chance rule. If it did create a dangerous situation, plaintiff was aware of it from the beginning, and could easily have avoided it, either by stepping to one side of the street or by watching the automobile so as to keep out of its path. In this version of the facts it cannot be said that there was any point of time when the defendant

could, and the plaintiff could not, have avoided the injury.''

In view of the lengthy summary of the appellant's testimony in the instant case and the foregoing statement quoted from *Palmer* v. *Tschudy,* it is unnecessary to stress, by paraphrase or otherwise, the similarity of the two cases. There are minor differences. Tschudy's automobile was going no faster than 5 or 6 miles an hour, and was, of course, much lighter than the interurban car and could have been stopped much quicker. The automobile was traveling on a street 56 feet wide, with no other vehicle in the immediate vicinity, while the interurban car had no leeway whatever, but could operate only on its rails. These minor differences, however, only serve to emphasize the nonapplicability herein of the last clear chance rule. As was said in *Poncino* v. *Reid-Murdock Co.,* 136 Cal.App. 223, 228, *supra,* ''. . . where there is no evidence from which it might be found that all of said elements are present, it is reversible error to instruct the jury with respect to said doctrine (citation).'' Here several elements were absent.

It might be added that the motorman testified that he did not see appellant until immediately before the impact. He was asked, ''As you were passing the northbound car, did you see him?'' and answered ''Oh, just when he run from behind that car—it happened so—I would judge just a few feet.'' He testified that appellant was ''running right straight across'' with his back ''partly to me, running.'' His testimony was that appellant was hit about 20 or 21 feet south of the Baden crossing. On cross-examination he testified that appellant was ''about ten, maybe fifteen feet, something like that'' in front of his car when he first saw him, and he threw off the power and applied the brakes at once.

Appellant points out that no bell was rung or other warning given. His admission that he had seen the oncoming car renders this failure immaterial. In *Starck* v. *Pacific Electric Ry. Co.,* 172 Cal. 277, 282 [156 P. 51, L.R.A. 1916E 58], it is said: ''Where a plaintiff by his own testimony admits that he knew of the approach of the car, the failure of the defendant to sound an alarm has no causal connection with the accident. See, also, *Morales* v. *L. W. Blinn Lumber Co.,* 9 Cal.App.2d 292, 294 [49 P.2d 621].

Appellant next contends that the court committed prejudicial error in refusing to admit in evidence several operating rules of the respondent railway. It is sufficient for the pur-

poses of this point to concede that such rules would have shown that the car should have slowed down to either 3 or 8 miles an hour because Baden crossing was a station, or "junction," or "crossing," or because the car was "passing another car discharging passengers." Admittedly, the car was making from 25 to 30 miles an hour at the time.

The admission of these rules would have served to accentuate respondents' negligence and to paint a more aggravated picture.

The refusal to instruct on last clear chance left with the jury the two issues of negligence and contributory negligence. Their verdict was a general one in favor of the defendants. From the verdict there is no way of telling whether the jury went on the theory (1) that the defendants were not at all negligent, or (2) that they were, and that the negligence of the plaintiff, in concurrence with their own, proximately caused the accident. In *Schultheiss* v. *Los Angeles Ry. Corp.*, 11 Cal.App.2d 525, 528 [54 P.2d 49], a similar situation was presented and the court said:

"It might also be here observed that a reading of the transcript of the evidence in this case clearly shows that the verdict of the jury herein could as well have been based upon a total lack of negligence on the part of respondent as upon contributory negligence upon the part of the appellant through a violation of the ordinance in question. In such a situation appellate courts will not look behind the verdict in an attempt to ascertain the theory adopted by the jury."

■ It is settled law that "a general verdict imports findings in favor of the prevailing party on all material issues, and if upon such a verdict one issue alone is sustained by the evidence and is not affected by any error, the want of evidence to sustain the finding on the other issues or any errors committed in regard to them cannot be prejudicial." (2 Cal.Jur., p. 1029. See, also, 24 Cal.Jur., p. 885.)

There is, of course, abundant evidence to sustain the implied finding of contributory negligence, and appellant does not challenge such sufficiency. Indeed, in conceding it he says that no such issue is involved.

■ That being so, it follows that the admission of the operating rules, addressed as they necessarily must have been, to respondents' negligence, which is implicit in the verdict, could not have changed the result. Hence the rejection of the rules was not prejudicial error. The ruling was

probably not erroneous at all. (See *Poncino* v. *Reid-Murdock & Co.*, 136 Cal.App. 223, 232 [28 P.2d 932], and cases there cited.)

Appellant moved for a new trial on the grounds, among others, of irregularities and misconduct.

■ The first misconduct is charged against respondents' counsel. It is claimed that they repeatedly got before the jury the idea that their side had an eyewitness who saw the appellant run in front of the train. Such witness, however, was never produced, and this very fact ordinarily would not, in the nature of things, harm the appellant but might—in view of the implied promise to produce her—harm the respondents. Be that as it may, the colloquies were all in open court and the judge was a party to them, made his own comments on them, and ruled in each instance in favor of the appellant. He "was in a better position to determine whether or not the situation worked to the prejudice of appellant than is this court" (*Mast* v. *Claxton*, 107 Cal.App. 59, 67 [290 P. 48]). The objection is made that there was repetition and reiteration but these remarks are not in the same category as, for instance, repeated charges of the suppression of evidence (*Keena* v. *United Railroads*, 197 Cal. 148 [239 P. 1061]).

■ Next, misconduct is alleged in affidavits respecting the *voir dire* examination of one of the jurors. He answered that he had heard all the questions put to the others, and when asked whether his answers would generally be the same as theirs, replied "I would be a fair juror." He was then asked the leading question, "You have no friends or relatives employed by the city?" and answered in the negative. "Q. And you don't know any of the attorneys in the City Attorney's office? A. No."

It never was brought out that he knew anybody in the city attorney's office, but by affidavit it was shown that *some days after the trial* he was seen talking to two police officers in the place where he was employed, and from all appearances they were friendly. Their affidavits were not produced, nor was it shown when this friendship arose, or how close it was. It also developed that he had a brother who was a *retired* police officer and that he, himself, had been on the force in San Francisco from July, 1923, to November, 1926, about 20 years before the trial; also that he knew many people around the city hall and the hall of justice. It appeared, also, that he had made strong and vociferous prodefense arguments in the jury room.

It cannot be questioned that a false answer on a *voir dire*

examination might easily be prejudicial misconduct but it must be borne in mind that the questions whether the juror had any friends or relatives employed by the city or knew any of the city attorney's staff, are not for a moment to be compared with such a case as *Williams* v. *Bridges*, 140 Cal. App. 537, 542 [35 P.2d 407], where the juror had seen the fence at about the time it did the damage, but answered that she knew "absolutely nothing" about the accident; nor with *Lindemann* v. *San Joaquin Cotton Oil Co.*, 5 Cal.2d 480 [55 P.2d 870], where the question was whether the juror knew the plaintiff; nor with *Mast* v. *Claxton, supra,* where the inquiry was as to an attorney-and-client relationship; nor with *Scott* v. *McPheeters,* 52 Cal.App.2d 61 [125 P.2d 868], where the inquiry was as to a doctor-and-patient relationship. It was much further removed, much more general, much less personal.

This case falls squarely within several well-settled rules. In *Balkwill* v. *City of Stockton,* 50 Cal.App.2d 661 [123 P.2d 596], it is said: "The trial judge has a sound discretion in granting or denying a motion for new trial even though the motion is based on affidavits. In the absence of clear abuse of such discretion the denial of a motion for new trial, which is based on affidavits will not be disturbed on appeal (*Spadoni* v. *Maggenti,* 121 Cal.App. 147, 156 [8 P.2d 874].)'' See, also, *Schultz* v. *Sussman,* 7 Cal.App.2d 100, 102 [45 P.2d 409].

In *Lafargue* v. *United Railroads,* 183 Cal. 720, 724 [192 P. 538], the court said: "The trial judge is in a much better position than an appellate court to determine whether the verdict in a case is probably due wholly or in part to such alleged misconduct as we have here, and his conclusion in the matter should not be disturbed unless, under all the circumstances appearing, it is plainly wrong.''

It is also settled that by its order denying a new trial "the court impliedly determined that no prejudice was suffered through the alleged misconduct of either counsel or the jury'' (*MacPherson* v. *West Coast Transit Co.,* 94 Cal.App. 463, 468 [271 P. 509], citing *Lafargue* v. *United Railroads,* 183 Cal. 720 [192 P. 538]). See, also, *Maffeo* v. *Holmes,* 47 Cal.App. 2d 292, 296 [117 P.2d 948].

And, lastly, "The jury must be presumed to have done its duty in reaching a verdict'' (*Maffeo* v. *Holmes,* 47 Cal.App. 2d 292, 297 [117 P.2d 948], citing Code Civ. Proc., § 1963, subd. 15).

The case of *Abercrombie* v. *Thomsen,* 59 Cal.App.2d 331 [138 P.2d 701], relied on by appellant is readily distinguish-

able. There the question was whether the juror was a client of one of the attorneys in the case. The trial court granted a new trial on this and other grounds. The opinion points to the similarity of the case to *Mast* v. *Claxton, supra* (an attorney-and-client case where the misconduct, if any, was held not to be reversible), and to the holding therein that "The question was entirely within the discretion of the trial court." It points out that in *Mast* v. *Claxton*, the motion for new trial was denied while in the Abercrombie case it was granted and that "a stronger showing is required to justify interference with an order granting," than one denying, a new trial (citing *Whitfield* v. *Debrincat*, 18 Cal.App.2d 730 [64 P.2d 960]). In conclusion the court speaks of the necessity for "a clear and affirmative showing of a gross, manifest or unmistakable abuse of discretion."

We are satisfied that there was no abuse of discretion in passing upon these questions of irregularity and misconduct.

The judgment is affirmed.

NOURSE, P. J.—I concur in the judgment and in the reasoning of the opinion. I can find no merit in appellant's argument that the municipal employees are bound by the rules adopted by the private corporation. The powers and duties of municipal and other governmental employees are prescribed by the statutes and in ordinances of the governmental agency. When the city purchased the rolling stock and equipment of the private company it did not obligate itself to abide by the method or the manner of operating the railway.

DOOLING, J.—I concur in the affirmance of the judgment. I am not satisfied however that if it was error to exclude the operating rules of the company we should assume on appeal in support of the judgment that the jury found the defendants guilty of negligence. As pointed out in the main opinion the verdict may as well be attributed to a jury finding that defendants were not negligent, a result that might not have been arrived at if the operating rules had been admitted. In a close case, assuming that the operating rules were properly admissible, their exclusion, in my judgment, would require a reversal. On the record, however, the proof of plaintiff's contributory negligence is so convincing (although because of his youth he may not be held guilty of negligence as a matter of law) that no miscarriage of justice can be said to have resulted from this ruling. (Cal. Const., art. VI, § 4½.) I prefer to place my concurrence on that point upon this ground.